No. 2025-1320

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

MICRON TECHNOLOGY, INC., MICRON SEMICONDUCTOR PRODUCTS, INC., MICRON TECHNOLOGY TEXAS, LLC,
*Appellants*,

v.

BESANG INC.,
*Appellee*.

---

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Proceeding No. IPR2023-00900

---

## PRINCIPAL BRIEF OF MICRON TECHNOLOGY, INC., MICRON SEMICONDUCTOR PRODUCTS, INC., AND MICRON TECHNOLOGY TEXAS, LLC

---


JOHN KAPPOS
O'MELVENY & MYERS LLP
2801 NORTH HARWOOD ST., STE. 1600
DALLAS, TX 75201
(972) 360-1900

XIN-YI ZHOU
BENJAMIN HABER
O'MELVENY & MYERS LLP
400 SOUTH HOPE STREET, 19TH FLOOR
LOS ANGELES, CA 90071
(213) 430-6000

WILLIAM FINK
KHANH LEON
O'MELVENY & MYERS LLP
1625 EYE STREET, NW
WASHINGTON, DC 20006
(202) 383-5300

*Attorneys for Appellants Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas, LLC*


April 7, 2025

**Representative Claim**

13. A semiconductor memory structure, comprising:

[a] a substrate having electrical devices formed therein, and further having a dielectric layer disposed above the electrical devices;

[b] *a stackable add-on layer having a plurality of vertically oriented semiconductor memory cells*; and

[c] the *stackable add-on layer being bonded to the dielectric layer*; and

[d] wherein the *memory cells are nonvolatile memory cells* having at least one transistor.

Appx90 ('702 patent), 12:24–34 (emphases added).

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2025-1320

**Short Case Caption** Micron Technology, Inc. v. BeSang Inc.

**Filing Party/Entity** Micron Technology, Inc., Micron Semiconductor Products, Inc., Micron Technology Texas, LLC

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 01/30/2025

Signature: /s/ John Kappos

Name: John Kappos

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Micron Technology, Inc. | | None/Not Applicable |
| Micron Semiconductor Products, Inc. | | Micron Technology, Inc. |
| Micron Technology Texas, LLC (Dissolved October 25, 2023.) | | None/Not Applicable |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| O'Melveny & Myers LLP | John Kappos | Xin-Yi Zhou |
| William Fink | Benjamin Haber | Khanh Leon |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ........................................................ 1
JURISDICTIONAL STATEMENT ........................................................ 1
INTRODUCTION ........................................................ 3
STATEMENT OF THE ISSUES ........................................................ 6
STATEMENT OF THE CASE ........................................................ 6
I. The Parties ........................................................ 6
II. Summary of the Asserted Patent and Claims ........................................................ 7
A. Background of the '702 Patent ........................................................ 7
B. The Prosecution History of the '702 Patent ........................................................ 9
C. The Challenged Claims ........................................................ 9
D. The Relevant Prior Art ........................................................ 10
1. The Watanabe Reference ........................................................ 10
2. The Endoh and Lee References ........................................................ 12
III. Procedural History of the '702 IPR ........................................................ 13
A. The IPR Petition, Patent Owner's Preliminary Response, and Petitioner's Preliminary Reply ........................................................ 13
B. The Institution Decision ........................................................ 14
C. The Patent Owner's Response and Micron's Reply ........................................................ 15
D. The Oral Hearing and Final Written Decision ........................................................ 17
SUMMARY OF THE ARGUMENT ........................................................ 19
STANDARD OF REVIEW ........................................................ 20
ARGUMENT ........................................................ 21
I. The Board erroneously construed claim 13 to require a bonding temperature at or below 650° C. ........................................................ 21

**TABLE OF CONTENTS**
**(continued)**

**Page**

A. The Board implicitly construed claim 13 to require a 650° C temperature limit. ........................................................ 22

B. The Board's construction of claim 13 was erroneous. ............ 24

C. The Board's erroneous construction tainted the rest of its analysis and is an independent basis for reversal. .................... 29

II. The Board erred by failing to consider Watanabe for all it teaches in view of the knowledge of a skilled artisan in an obviousness analysis, instead conducting an erroneous enablement analysis. ...................................................................... 30

A. The Board erred by failing to apply a proper obviousness analysis to Watanabe. ............................................................... 34

B. The Board's conclusion that Watanabe was not enabling is erroneous. ........................................................................ 40

C. The Board's treatment of the evidence is riddled with further errors. ....................................................................... 44

III. The Board's disregard of Micron's arguments regarding nonvolatile memory as new was an abuse of discretion; its failure to consider Watanabe for all that it teaches was arbitrary and capricious; and its application of Watanabe to claim elements 13[a]–[c] lacks substantial evidence. .................................. 47

A. The Board abused its discretion in concluding that Micron's reply arguments addressing Watanabe's nonvolatile memory teaching were new and should be ignored. ........................................................................ 48

B. The Board's failure to consider Watanabe for all that it teaches was arbitrary and capricious. ...................................... 51

C. The Board's finding that Watanabe's teachings were confined to DRAM lacks substantial evidence support............ 54

**TABLE OF CONTENTS**
**(continued)**


**Page**

IV. The Board erred by not applying a flexible approach in its motivation-to-combine analysis for claims 13–15 in view of Lee and Watanabe, as required by *KSR*. ....55

A. The Board erroneously analyzed the motivation to combine Lee and Watanabe by disregarding the knowledge of a skilled artisan....58

B. The Board erroneously required Micron to show a specific motivation to improve the Lee reference based on a particular benefit from Watanabe. ....60

CONCLUSION....62

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC*,
825 F.3d 1373 (Fed. Cir. 2016) ....................53

*Amgen Inc. v. Sanofi*,
598 U.S. 594 (2023)....................40

*Apple Inc. v. Andrea Elecs. Corp.*,
949 F.3d 697 (Fed. Cir. 2020) .................... 20, 50

*Apple Inc. v. Corephotonics, Ltd.*,
861 F. App'x 443 (Fed. Cir. 2021) ....................40

*Aqua Prods., Inc. v. Matal*,
872 F.3d 1290 (Fed. Cir. 2017) ....................46

*Ariosa Diagnostics v. Verinata Health, Inc.*,
805 F.3d 1359 (Fed. Cir. 2015) ....................49

*Beckman Instruments, Inc. v. LKB Produkter AB*,
892 F.2d 1547 (Fed. Cir. 1989) ....................37

*Belden Inc. v. Berk-Tek LLC*,
805 F.3d 1064 (Fed. Cir. 2015) .................... 20, 52

*Bilstad v. Wakalopulos*,
386 F.3d 1116 (Fed. Cir. 2004) ....................20

*Cephalon, Inc. v. Watson Pharms., Inc.*,
707 F.3d 1330 (Fed. Cir. 2013) .................... 40, 41, 42

*Chamberlain Grp., Inc. v. One World Techs., Inc.*,
944 F.3d 919 (Fed. Cir. 2019) ....................48

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
358 F.3d 1371 (Fed. Cir. 2004) ....................28

*Cisco Sys., Inc. v. K.Mizra LLC*,
No. 2022-2290, 2024 WL 3841809 (Fed. Cir. Aug. 16, 2024) ....................59

**TABLE OF AUTHORITIES**
**(continued)**

**Page**


*Cont'l Cirs. LLC v. Intel Corp.*,
915 F.3d 788 (Fed. Cir. 2019) .......... 24, 25, 26

*Convolve, Inc. v. Compaq Comp. Corp.*,
527 F. App'x 910 (Fed. Cir. 2013) .......... 42

*CRFD Research, Inc. v. Matal*,
876 F.3d 1330 (Fed. Cir. 2017). .......... 59, 60

*Ericsson Inc. v. Intell. Ventures I LLC*,
901 F.3d 1374 (Fed. Cir. 2018) .......... 20, 48, 49, 50

*EWP Corp. v. Reliance Universal Inc.*,
755 F.2d 898 (Fed. Cir. 1985) .......... 52

*Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l LLC*,
618 F.3d 1294 (Fed. Cir. 2010) .......... 29, 40

*HTC Corp. v. Cellular Comms. Equip., LLC*,
877 F.3d 1361 (Fed. Cir. 2017) .......... 21

*In re Antor Media Corp.*,
689 F.3d 1282 (Fed. Cir. 2012) .......... 40, 41

*In re Etter*,
756 F.2d 852 (Fed. Cir. 1985) (en banc) .......... 52

*In re Morsa*,
713 F.3d 104 (Fed. Cir. 2013) .......... 40

*In re Morsa*,
803 F.3d 1374 (Fed. Cir. 2015) .......... 19, 39

*In re Mouttet*,
686 F.3d 1322 (Fed. Cir. 2012) .......... 52

*In re Swartz*,
232 F.3d 862 (Fed. Cir. 2000) .......... 36

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*In re Wands*,
858 F.2d 731 (Fed. Cir. 1988) .................................................................. 40, 42

*Intel Corp. v. PACT XPP Schweiz AG*,
61 F.4th 1373 (Fed. Cir. 2023) .................................................................. 56, 59

*Intel Corp. v. Qualcomm Inc.*,
21 F.4th 784 (Fed. Cir. 2021) .......................................................................56

*Intel Corp. v. Qualcomm Inc.*,
21 F.4th 801 (Fed. Cir. 2021) .......................................................................20

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016) .....................................................................48

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)........................................................................... passim

*Laitram Corp. v. NEC Corp.*,
163 F.3d 1342 (Fed. Cir. 1998) .....................................................................23

*Mylan Pharms. Inc. v. Merck Sharp & Dohme Corp.*,
50 F.4th 147 (Fed. Cir. 2022) .......................................................................19

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) .........................................................23

*Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*,
786 F.3d 960 (Fed. Cir. 2015) .......................................................................44

*Provisur Techs., Inc. v. Weber, Inc.*,
50 F.4th 117 (Fed. Cir. 2022) ............................................................ 56, 57, 59

*Randall Mfg. v. Rea*,
733 F.3d 1355 (Fed. Cir. 2013) .....................................................................58

*Raytheon Techs. Corp. v. Gen. Elec. Co.*,
993 F.3d 1374 (Fed. Cir. 2021) .......................................................... 34, 35, 36

# TABLE OF AUTHORITIES
**(continued)**

**Page**


*Rembrandt Diagnostics, LP v. Alere, Inc.*,
76 F.4th 1376 (Fed. Cir. 2023) ....................48

*Resonate Inc. v. Alteon Websystems, Inc.*,
338 F.3d 1360 (Fed. Cir. 2003) ....................23

*Storer v. Clark*,
860 F.3d 1340 (Fed. Cir. 2017) ....................20

*Symbol Tech., Inc. v. Opticon, Inc.*,
935 F.2d 1569 (Fed. Cir. 1991) ....................37

*Thorner v. Sony Computer Ent. Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012) ....................24

*Trustees of Bos. Univ. v. Everlight Elecs. Co.*,
896 F.3d 1357 (Fed. Cir. 2018) ....................36

*Uber Techs., Inc. v. X One, Inc.*,
957 F.3d 1334 (Fed. Cir. 2020) ....................53

**STATUTES**

28 U.S.C. § 1295(a)(4)(A) ....................1

35 U.S.C. § 141(c) ....................1

35 U.S.C. § 142 ....................1

35 U.S.C. § 311 ....................1

35 U.S.C. § 319 ....................1

5 U.S.C. § 706 ....................19

**REGULATIONS**

37 C.F.R. § 42.23(b) ....................30

## STATEMENT OF RELATED CASES

No other appeal in or from the same proceedings in the Patent Trial and Appeal Board ("Board") was previously before this or any other appellate court. U.S. Patent No. 7,378,702 ("the '702 patent"), which is the subject of the *inter partes* review ("IPR") proceeding on review in this appeal, is currently asserted in *BeSang Inc. v. Micron Tech., Inc., et al*, Case No. 2:23-cv-00028 (E.D. Tex.) and *BeSang Inc. v. Intel Corp.*, Case No. 3:23-cv-00113 (D. Or.). The '702 patent was subject to IPR Nos. IPR2023-00900 and IPR2023-00991. In addition to this appeal, an appeal from the Final Written Decision in IPR No. IPR2023-00991 is currently pending before this Court as Case No. 25-1377.

## JURISDICTIONAL STATEMENT

This appeal arises from an IPR proceeding filed by Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas, LLC[1] (collectively, "Micron") before the Patent Trial and Appeal Board pursuant to 35 U.S.C. §§ 311 et seq. The Board entered a Final Written Decision in IPR2023-00900 on November 13, 2024. Micron timely filed a notice of appeal on December 20, 2024. 35 U.S.C. § 142. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141(c) and 319.

[1] Micron Technology Texas, LLC dissolved on October 25, 2023 and is no longer a company or legal entity.

## INTRODUCTION

This appeal involves the Board erroneously taking a disclosed, but not claimed, temperature range from the specification of the challenged patent, reading that temperature range into the challenged claims, and rejecting the relevance of a cited reference because it disclosed temperatures above the specific and unclaimed temperature range. The Board erroneously concluded that a prior art reference that bonded semiconductor layers at 900–1000° C used a temperature that was too high. This error prevented the Board from properly analyzing the reference under the applicable obviousness, enablement, or motivation to combine standards.

The claims-at-issue from the ’702 patent involve known techniques of manufacturing a semiconductor memory device. The elements of independent claim 13 of the ’702 patent require (1) “[a] semiconductor memory structure, comprising” (2) “a substrate having electrical devices formed therein, and further having a dielectric layer disposed above the electrical devices;” (3) “a stackable add-on layer having a plurality of vertically oriented semiconductor memory cells; and” (4) “the stackable add-on layer being bonded to the dielectric layer;” (5) “wherein the memory cells are nonvolatile memory cells having at least one transistor.” After BeSang sued Micron on claim 13 and dependent claims 14–16, Micron filed an *inter partes* review for the Board to reconsider the patentability of claims 13–17 of the

’702 patent in view of Watanabe and other references. The Board instituted proceedings.

The Board determined that Micron had not demonstrated by a preponderance of the evidence that claims 13–17 were unpatentable. But the Board’s decision was based on a nonexistent temperature requirement. First, the Board construed claim 13 to require something not supported by the intrinsic evidence—that the bonding temperature must be kept at or below 650° C. This construction infected the rest of the Board’s analysis: the Board required Watanabe to work at 650° C to be self-enabled, to be considered with other evidence in an obviousness analysis, and to be considered by a skilled artisan when assessing whether there was a motivation to combine. The Board treated a skilled artisan as an automaton, requiring Micron and its expert to calculate a time and temperature under a thermal budget. The Board’s analysis contradicted *KSR*, which requires a flexible approach (to apply the knowledge a skilled artisan would have) to the obviousness and motivation to combine inquiries.

This appeal also cites to the Board’s error in reading arguments and prior art too narrowly. The Board’s finding that Watanabe’s teachings are limited to a DRAM embodiment is unsupported by substantial evidence, and the Board’s characterization of Micron’s argument and evidence was arbitrary and capricious. Watanabe explicitly states its applicability to “any type of memory device,” and the

Board misconstrued Micron's arguments as if Micron was combining different embodiments.

## STATEMENT OF THE ISSUES

1. Whether the Board improperly construed claim 13 to require a bonding temperature of 650° C or less?

2. Whether the Board's obviousness and enablement analyses were legally erroneous by failing to consider the teachings of Watanabe under *KSR*?

3. Whether the Board's rejection of arguments about Watanabe's teachings as applicable to nonvolatile memory was an abuse of discretion and was unsupported by substantial evidence, where Watanabe states its teachings are "applicable to any type of memory device," which includes nonvolatile memory?

4. Whether the Board's motivation-to-combine analysis was legally erroneous by failing to consider the teachings of Lee and Watanabe under *KSR*, and categorically requiring a motivation to achieve a specific benefit?

## STATEMENT OF THE CASE

### I. The Parties

Micron (Petitioner-Appellant) was founded as a startup in 1978 in Boise, Idaho. Today, Micron is a global leader in electronic memory and storage solutions in dynamic random-access memory (DRAM), NAND, and NOR technology.

BeSang (Patent Owner-Appellee) owns patents relating to three-dimensional DRAM and nonvolatile memory.

## II. Summary of the Asserted Patent and Claims

### A. Background of the '702 Patent

The '702 patent, entitled "Vertical Memory Device Structures," issued May 27, 2008, to Sang-Yun Lee and is assigned to BeSang. Appx50. The '702 patent states that "[v]ertically oriented semiconductor memory cells are added to a separately fabricated substrate that includes electrical devices and/or interconnect." Appx50. The '702 patent "relates to a semiconductor substrate combined with a relatively thin add-on semiconductor layer in which various vertically oriented memory elements are fabricated." Appx85, 1:16–19. The '702 patent refers to these add-on semiconductor layers as "stackable add-on layers." Figure 1, annotated below, illustrates a "three-dimensional integrated circuit that includes a semiconductor substrate [(red)] having devices [(purple)] and/or interconnect structures fabricated thereon." Appx87, 5:11–14. As shown below, base substrate 103 is bonded to "lower dielectric layer 151," comprising "[i]nter-layer dielectric (ILD) layers 133 [(green)]," which are disposed above the devices (purple) formed in the base substrate. Appx87, 5:31–33, 5:37–41.

Fig. 1




Appx51, Fig. 1 (annotated).

Figure 1 also illustrates memory transistors (*i.e.*, vertical memory devices 656 (blue)) with their source, channel, and drain regions oriented vertically or "substantially perpendicular to a major surface of a substrate." Appx86, 4:7–9.

Relevant to this appeal is the 3-D integrated circuit's at "least one stackable add-on layer"—(*i.e.*, floating device layer (FLD) 101 with vertical memory devices 656 (blue) therein)—"also having devices and/or interconnect, where the semiconductor substrate and the stackable add-on layer are stacked and bonded to each other." Appx87, 5:14–17. The '702 patent describes forming "vertically oriented semiconductor memory cells" in a separately fabricated "stackable add-on layer," which is then bonded to the semiconductor substrate. *See* Appx87, 5:5–7, 5:11–41. The '702 patent further describes that each stackable add-on layer 101 has "interlayer dielectric (ILD) layers 133 [(green)] disposed above and below."

Appx86–87, 3:51–54, 5:11–17, 5:29–33.

The ’702 patent further states that “Dynamic Random Access Memory (DRAM) cells, Static Random Access Memory (SRAM) cells, nonvolatile memory cells, and similar structures may be formed in a stackable add-on layer for use in conjunction with the separately fabricated substrate.” Appx85, 2:4–9. Claims 1–12 are limited to DRAM and SRAM semiconductor memory structures, whereas claims 13–17 recite nonvolatile semiconductor memory structures. *See* Appx89–90, 10:47–12:52.

### B. The Prosecution History of the ‘702 Patent

During the prosecution of the ’702 patent, the examiner issued a single non-final office action, with an objection based on indefiniteness and a rejection based on obviousness-type double patenting. *See* Appx580. Applicant cited no prior art. The examiner did not make substantive rejections based on prior art and cited only one reference during prosecution. *See* Appx583 (citing U.S. Patent No. 6,943,067). The ’702 patent issued after the applicant amended the claims and filed a terminal disclaimer to overcome the double patenting rejection over the claims of U.S. Patent No. 7,052,941. Appx596–97; Appx629.

### C. The Challenged Claims

This appeal involves claims 13–17 of the ’702 patent. Most of these claims are asserted against Micron in the related district court case.

The Board found independent claim 13 to be illustrative of the challenged claims. It recites:

> 13. A semiconductor memory structure, comprising:
>
> [a] a substrate having electrical devices formed therein, and further having a dielectric layer disposed above the electrical devices;
>
> [b] a stackable add-on layer having a plurality of vertically oriented semiconductor memory cells; and
>
> [c] the stackable add-on layer being bonded to the dielectric layer; and
>
> [d] wherein the memory cells are nonvolatile memory cells having at least one transistor.

Appx90, 12:24–34.

Claims 14–17 depend from claim 13 and recite minor variations thereof. Appx90, 12:35–52.

### D. The Relevant Prior Art

#### 1. The Watanabe Reference

Watanabe, U.S. Patent No. 5,091,762, entitled "Semiconductor Memory Device with a 3-Dimensional Structure," issued February 25, 1992. Appx671.

Watanabe discloses an objective "to provide a semiconductor memory device in which memory cells are arrayed three-dimensionally, thereby providing a high integration density." Appx679, 1:49–52. For example, Figures 1, 2A, and 7 depict stacks of vertically oriented semiconductor memory cells. *See* Appx679–81, 2:44–51, 3:12–15, 6:15–19.




F I G. 1




F I G. 2A




F I G. 7

Appx672–73.

Watanabe further explains that although its description depicts the memory cell "as incorporated in a DRAM," "[t]he memory cell of the present invention is applicable to any type of memory device i.e., a SRAM, a PROM [(programmable readable memory)], or a DRAM." Appx679, 2:51–55. For example, Figure 7 depicts an "application of the present invention into an EPROM [(erasable PROM)]," which is a form of nonvolatile memory. Appx679, 2:36–37.

Watanabe further discloses two techniques to fabricate a semiconductor memory device. Appx681, 5:68–6:19. First, Figures 5A through 5E illustrate the sequence of manufacturing steps under the "laminating" technique, which requires sequential deposition of thin layers to build semiconductor memory cells. Appx679, 2:26–30; Appx676–77 (Figs. 5A–5E). Second, Figures 6A through 6D illustrate the sequence of manufacturing steps under the "stacking" technique, wherein layers of semiconductor memory cells are fabricated separately from the substrate and then stacked and bonded to the substrate. Appx681, 5:31–35; Appx678 (Figs. 6A–6D).

### 2. The Endoh and Lee References

Endoh, U.S. Patent Application Publication No. 2002/0154556, entitled "Semiconductor Memory and Its Production Process," published October 24, 2002. Appx683. Endoh discloses pillar-form semiconductor memory devices and acknowledges that the rapid development of nonvolatile memory cells made it important to ensure large capacity between the floating gate and control gate. Appx2317 ¶ 6. Endoh describes a process to form transistors or memory cells "in a direction vertical to the substrate" using "island-like semiconductor layers in a pillar form." *See* Appx2320 ¶ 48; Appx2326 ¶ 183.

Lee, U.S. Patent No. 6,881,994, entitled "Monolithic Three Dimensional Array of Charge Storage Devices Containing a Planarized Surface," issued April 19, 2005. Appx2426. Lee discloses "a monolithic three dimensional array of charge

storage devices which includes a plurality of device levels." Appx2426. Lee also discloses a technique for fabricating "a nonvolatile stackable pillar memory device" and "a three dimensional nonvolatile memory array, comprising a plurality of vertically separated device levels, each level comprising an array of TFT [(thin film transistor)] EEPROMs [(electrically erasable programmable read-only memory)]." Appx2519, 5:28–56.

## III. Procedural History of the '702 IPR

### A. The IPR Petition, Patent Owner's Preliminary Response, and Petitioner's Preliminary Reply

On May 4, 2023, Micron filed an IPR petition ("the Petition") seeking review of claims 13–17 of the '702 patent. Appx200; Appx207. Micron argued that the claims were rendered obvious by Watanabe alone, Watanabe in view of Endoh, Lee alone, Lee in view of Endoh, Lee in view of Watanabe, and Lee in view of Watanabe and Endoh. Appx209–10.

Patent Owner filed a preliminary response arguing that Micron's reliance on the DRAM embodiments of Watanabe cannot satisfy claim 13, which requires nonvolatile memory. *See* Appx2981–90. Patent Owner acknowledged Watanabe's statement that the "memory cell of the present invention is applicable to any type of memory device i.e., a SRAM, PROM, or a DRAM," but argued that Micron failed to "articulate a motivation to combine those different devices" and that Micron improperly combined features from different embodiments. Appx2982–85.

Micron filed a preliminary reply, explaining that Patent Owner's arguments were moot because the Petition did not combine disparate embodiments. Appx3233. Micron clarified that a skilled artisan would have taken Watanabe's statement that the "memory cell . . . is applicable to any type of memory i.e., a SRAM, a PROM, or a DRAM" to mean that Watanabe's fabrication techniques were applicable to any type of memory device—volatile (like DRAM) or nonvolatile (like PROM). Appx3234. Micron also explained that because Watanabe explicitly teaches applicability to any type of memory, the Petition does not combine different embodiments to demonstrate unpatentability. Appx3235–36.

### B. The Institution Decision

The Board instituted review of the '702 patent on November 17, 2023. Appx3258. Neither party explicitly construed any terms of the claims. Appx3264. The Board, however, determined that the term "a stackable add-on layer" warranted construction. Appx3264. The Board agreed with Micron that "a stackable add-on layer" is "a layer that is formed separately from the substrate and then bonded as whole to the dielectric layer positioned above the substrate." Appx3266. The Board encouraged the parties to expressly construe a "stackable add-on layer" during trial and distinguish it "from a layer that is sequentially deposited." Appx3266.

### C. The Patent Owner's Response and Micron's Reply

In its response, Patent Owner argued, among other things, that a skilled artisan would not have been motivated to combine Lee with Watanabe because Watanabe's high-temperature bonding would exceed the thermal budget and therefore damage Lee's transistors. Appx3362–70. Patent Owner's assertion relies on two cherrypicked data points. First, Patent Owner pointed to a statement made by Micron's expert Dr. Lee, in which he testified that heating transistors above 650° C would damage them. *See* Appx3363. But Patent Owner failed to acknowledge Dr. Lee's clarification on the follow-up questioning immediately thereafter that both temperature *and time* were considerations in the "thermal budget." Appx3634 (Tr. 125:6–14). Second, Patent Owner's assertion relies on a single example in Watanabe in which the semiconductor structure had 100 planar members, while omitting Watanabe's other example with two planar members bonded on top of a substrate. *See* Appx3757–58 ¶¶ 76–77 (citing Appx680, 4:35–38 (100-plane example)); Appx681, 6:6–14 (two-plane example). Patent Owner again argued that the Petition failed to establish a motivation to combine Watanabe's different embodiments and failed to establish that Watanabe taught the "nonvolatile" limitation. Appx3398–401. And similar to its argument for Lee-Watanabe, Patent Owner argued that Watanabe's stacking technique was not enabled because of Watanabe's high-temperature bonding. Appx3404–05.

In its reply, Micron argued that a skilled artisan would have been motivated to combine Lee and Watanabe, and would have had a reasonable expectation of success in doing so. Appx4147–54. Micron explained that a skilled artisan "would have known about bonding techniques consistent with Watanabe's bonding temperature (*i.e.*, 900–1000° C) that do not exceed the thermal budget and avoid damage to the lower memory cells," such as using a rapid heating technique called electromagnetic induction heating (EMIH). Appx4148–50 (citing Appx4412–17 ¶¶ 35–44; Appx4726; Appx4728–29; Appx4731 (Table 1)). Micron also proffered expert testimony and evidence showing that a skilled artisan would have known about methods like EMIH to bond all levels of the memory array at once. Appx4149 (citing Appx4417 ¶ 44; Appx4915; Appx4820). In the same vein, Micron also argued that Watanabe's stacking technique is enabled—specifically that a skilled artisan would have known how to bond wafers at high temperatures using well-known methods, such as EMIH, without exceeding the thermal budget. Appx4159–60. And consistent with its preliminary reply argument, Micron argued that Watanabe's teachings apply equally to DRAM and nonvolatile memory, and thus the Petition did not combine embodiments. Appx4156–58.

On sur-reply, Patent Owner attacked Micron's argument that a skilled artisan would have known how to bond wafers at high temperatures as a "new" theory and outside the scope of reply. Appx5019–20. Patent Owner then argued that Micron's

expert failed to specify the time necessary to heat the layers at a high temperature. Appx5021–23. Patent Owner further argued that "the Petition never included an unpatentability theory premised on implementing Watanabe's memory cells in a NAND architecture." Appx5027–28; Appx5032–33.

### D. The Oral Hearing and Final Written Decision

On August 22, 2024, the Board held an oral hearing. Appx5305. During the hearing, the panel discussed, as relevant to this appeal, the motivation to combine Lee and Watanabe, whether bonding at 900 to 1000° C would exceed the thermal budget, and the applicability of Watanabe's teachings to nonvolatile memory. *See* Appx5313–16; Appx5318–20. Micron maintained its position that a skilled artisan would have been motivated to combine Watanabe and Lee to improve integration density by stacking, Appx5316–17; that thermal budget was not a problem for methods like EMIH that could bond multiple stackable add-on layers in a single step, Appx5314–15; and that Watanabe's memory cell and fabrication techniques are applicable to any type of memory device, and thus Micron's grounds based on Watanabe were not a combination of embodiments, Appx5318.

The Board issued its Final Written Decision on November 13, 2024. Appx1. The Board agreed with Micron that claim 13's "stackable add-on layer" means "a layer formed separately from the substrate suitable to be bonded to the dielectric layer positioned above the substrate." Appx10–13. The Board elaborated that the

"stackable add-on layer" does not "include memory cells that are formed by sequential deposition." Appx13. Based on this definition, the Board rejected Micron's grounds based on Lee alone and Lee in view of Endoh because "Lee's memory devices are formed by sequential deposition."[2] Appx13–19.

The Board then determined that Micron failed to meet its burden for the Watanabe-based grounds for two reasons. First, the Board concluded that Micron failed to explain how to combine the "volatile and non-volatile embodiments," or how to construct "the nonvolatile memory of Figure 7" using the stacking technique. Appx26. The Board found that Watanabe's Figures 1–6 relate to the DRAM embodiment, and the Petition "never identifies where Watanabe teaches or suggests elements 13[a]–[c] outside a DRAM embodiment, which lacks the nonvolatile

---

[2] Based on its conclusion for claim 13, the Board also concluded that Micron did not demonstrate by a preponderance of the evidence that claims 14–17 would have been obvious over the combination of Watanabe and Endoh (Ground 2), that claims 13–17 would have been obvious over the combination of Lee and Watanabe (Ground 5), and that claims 16–17 would have been obvious over the combination of Lee, Watanabe, and Endoh (Ground 6). Because the Board's conclusions on these grounds are based on the errors identified in this appeal and should be vacated for the reasons herein, any remand to the Board must address Micron's remaining arguments on these grounds.

In addition, Micron agrees with the Board's claim construction for "stackable add-on layer"—that term does not encompass sequential deposition. Ground 3 (Lee) and Ground 4 (Lee in view of Endoh) are thus not at issue on appeal because those grounds rely on Lee's sequential deposition technique, which is outside of the scope of the claims as correctly construed by the Board. Micron maintains that if "stackable add-on layer" encompasses sequential deposition, Lee and Lee-Endoh would render claims 13–17 obvious.

memory cells of element 13[d].” Appx27. The Board then concluded that Micron’s “argument that the nonvolatile memory cell depicted in Figure 7 could be substituted in” Figure 2A was a “new theory presented for the first time in reply.” Appx27. The Board explained that, even if it considered this “new argument,” “the combination of Figs. 2A and 7” failed to satisfy claim elements 13[a]–[c]. Appx28.

Second, the Board held that Watanabe’s stacking technique was not enabled. Appx28–36. Relying on the ’702 patent’s specification, which described, using permissive language, that the bonding temperature “may be” up to 650° C, the Board dismissed Micron’s arguments and evidence supporting a bonding temperature at 900–1000° C. Appx28–36. The Board’s erroneous reasoning carried over to the other Watanabe-based grounds. For example, the Board explained that Watanabe’s bonding temperature of 900–1000° C would have discouraged any motivation to combine Watanabe with Lee or Endoh. *See* Appx40–43.

## SUMMARY OF THE ARGUMENT

The Board concluded that Micron failed to show that claims 13–17 were unpatentable. First, the Board improperly construed claim 13 to require a bonding temperature at or below 650° C. Based on this construction, the Board improperly analyzed Micron’s obviousness arguments. For Micron’s obviousness ground based on Watanabe alone, the Board made several errors. The Board failed to perform an obviousness analysis under *KSR*. Instead, the Board, applying the improper

construction, concluded that Watanabe was not enabled because of Watanabe's bonding temperature of 900–1000 C. The Board also reached conclusions regarding enablement that are unsupported by substantial evidence. Then, the Board abused its discretion by concluding that Micron's nonvolatile-memory arguments on reply were "new." Further, the Board's finding that Watanabe's teachings were limited to DRAM is unsupported by substantial evidence. Finally, for Micron's obviousness ground based on Lee in view of Watanabe, the Board relied on its erroneous lack-of-enablement conclusion for Watanabe to find that a skilled artisan would not have been motivated to combine Lee and Watanabe. The Board again strayed from what is required under *KSR* in its motivation-to-combine analysis for Lee in view of Watanabe. The Board also erred in categorically requiring a motivation to achieve a specific benefit. For these reasons, the Court should vacate and remand.

## STANDARD OF REVIEW

Claim construction, obviousness, and enablement are all questions of law, based on underlying factual findings. *See Google LLC v. EcoFactor, Inc.*, 92 F.4th 1049, 1054 (Fed. Cir. 2024); *Mylan Pharms. Inc. v. Merck Sharp & Dohme Corp.*, 50 F.4th 147, 152 (Fed. Cir. 2022); *In re Morsa*, 803 F.3d 1374, 1377 (Fed. Cir. 2015) (*Morsa II*). The Board's legal conclusions are reviewed *de novo*, and its factual findings—such as the "scope and content of the prior art" or the motivation to combine prior art references—are reviewed for substantial evidence. *Storer v.*

*Clark*, 860 F.3d 1340, 1345 (Fed. Cir. 2017); *see Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015). For claim construction, "any underlying fact findings about extrinsic evidence" are reviewed "for substantial-evidence support when the appeal comes from the Board." *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 808 (Fed. Cir. 2021).

The Court must set aside any Board finding that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or is "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E).

Whether a party exceeded the scope of a proper reply is reviewed for an abuse of discretion. *Apple Inc. v. Andrea Elecs. Corp.*, 949 F.3d 697, 705 (Fed. Cir. 2020). "An abuse of discretion is found if a decision: (1) is clearly unreasonable, arbitrary, or fanciful; (2) is based on an erroneous conclusion of law; (3) rests on clearly erroneous fact finding; or (4) involves a record that contains no evidence on which the Board could rationally base its decision." *Ericsson Inc. v. Intell. Ventures I LLC*, 901 F.3d 1374, 1379 (Fed. Cir. 2018) (quoting *Bilstad v. Wakalopulos*, 386 F.3d 1116, 1121 (Fed. Cir. 2004)).

## ARGUMENT

### I. The Board erroneously construed claim 13 to require a bonding temperature at or below 650° C.

Although the Board only explicitly construed one term in its Final Written Decision, the Board implicitly construed claim 13 by improperly importing a

permissive description from the specification into the claims. The Board interpreted the claims to require a bonding temperature at or below 650° C. This implicit claim construction is incorrect and requires reversal.

### A. The Board implicitly construed claim 13 to require a 650° C temperature limit.

Here, as part of its consideration of the Watanabe prior art, the Board imported a temperature requirement from the specification into the claims. The Board, in explaining its "enablement" analysis for Watanabe, stated that "[i]n contrast to Watanabe, the ***'702 patent expressly states that its processing temperature must not exceed 650° C***." Appx35 (citing Appx88 at 7:15–29) (emphasis added). The Board then proceeded to consider Micron's arguments by treating this 650° C temperature as a claim requirement. But neither the claims nor the patent specification sets a temperature limit.

Claim construction "define[s] the scope of the patented invention." *HTC Corp. v. Cellular Comms. Equip., LLC*, 877 F.3d 1361, 1367 (Fed. Cir. 2017). As this Court held in its recent *Google v. EcoFactor* decision, the "Board's statement that it was not engaging in claim construction is not dispositive as to whether claim construction occurred. We have found implicit claim constructions even when the Board does not recognize that it is construing a claim." 92 F.4th at 1056. And "[i]f the outcome of the analysis of the claim term establishes the scope (e.g., boundaries)

and meaning of the patented subject matter, the court (or the Board) has mostly likely construed the claim." *Id*. at 1055.

In assessing whether Micron's proposed grounds taught elements 13[a]–[c], the Board found in the claims, and then relied on, a nonexistent requirement that a bonding temperature must be at or below 650° C. This plainly staked out the Board's view of the "scope (e.g., boundaries) and meaning of the patented subject matter." *Id*. The Board then applied this 650° C temperature requirement in its analysis of Watanabe, concluded that Watanabe's bonding temperature range of 900 to 1000° C was too high, concluded that Watanabe's higher temperatures did not enable the imported low temperature limit of 650° C, and further concluded that Watanabe could not be used to demonstrate obviousness in view of this imported 650° C temperature requirement. The Board's rejection of Micron's prior art arguments is founded on this 650° C temperature requirement—without this imported requirement, the basis for rejecting Micron's argument evaporates. *See id*. at 1056 ("Had the Board instead interpreted the inputs of [1m] as non-distinct, its basis for rejecting Google's argument would evaporate."). Accordingly, the Board here implicitly construed claim 13 as having a 650° C requirement. As explained below, this construction is unsupported by the claim language and intrinsic record.

**B. The Board's construction of claim 13 was erroneous.**

Claim construction starts with the intrinsic evidence, *i.e.*, the claim language, the specification, and the prosecution history. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc). Extrinsic evidence is generally "less significant" than intrinsic evidence. *Id*. at 1317, 1319. The evidence here does not support a requirement of the bonding temperature being at or below 650° C.

First, the claim language does not contain any reference to any specific temperature at which the claimed structure must be fabricated. This itself can be dispositive; it is well settled that it is "the claims, not the written description, which define the scope of the patent right." *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998); *see Resonate Inc. v. Alteon Websystems, Inc.*, 338 F.3d 1360, 1364–65 (Fed. Cir. 2003) ("[T]he written description is not a substitute for, nor can it be used to rewrite, the chosen claim language."). There is simply nothing in the claims that requires a bonding temperature of no greater than 650° C when fabricating the claimed memory devices. Instead, the claims require a "semiconductor memory structure" having certain physical features. Some parts of the structure must have been "formed," "vertically oriented," or "bonded." There is no basis to limit the claims to a specific temperature where that limitation is absent from the claim language.

Second, there is no basis to import a non-limiting, exemplary embodiment from the specification into the claims. This Court has repeatedly warned against "improperly importing limitations into the claims." *Cont'l Cirs. LLC v. Intel Corp.*, 915 F.3d 788, 797 (Fed. Cir. 2019). Indeed, there are only two narrow circumstances where there may be a basis to do so: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comp. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). Neither of those narrow circumstances is present here.

The specification of the '702 patent uses permissive and exemplary language:

> The FLD, in accordance with the present invention, has a gate dielectric layer which ***may be*** implemented with process operations at temperatures below 650° C. The dielectric layer could be thermal oxide, deposited oxide, oxynitride, or a combination of oxide and nitride, such as an oxide-nitride oxide (ONO) layer, or a nitride-oxide (NO) layer. ***Any suitable dielectric material could be used*** except films requiring processing at temperatures more than 650° C. Another advantage of embodiments of the present invention is that it is easy to use high dielectric constant (high-k) materials in the gate dielectric layer . . . In conventional manufacturing of MOSFETs, a high temperature heat activation operation is required after the source/drain ion implantation. At this time, the properties of high-k materials can be altered. However, the FLD architecture ***does not*** require a high temperature process, and so high-k materials could be used at stable condition.

Appx88, 7:15–32 (emphases added). Indeed, the first sentence sets the context of the passage—this is a non-limiting example of a gate dielectric layer that could be implemented with process operations below 650° C. The passage cannot be read as

to preclude process operations or even heating up other layers and processes at or above 650° C. This passage then explains that a low-temperature process would permit the use of "high dielectric constant (high-k) materials," but it also acknowledges that higher temperature steps above 650° C would be required in "conventional manufacturing" that does not use "high-k materials." *See* Appx88, 7:20–32. Thus, the passage's use of permissive language—"may be" and "does not require"—indicates that a bonding temperature at or below 650° C is merely one way to implement the subject matter claimed by the '702 patent—not that it "must be" or "requires" being done at or below 650° C in all cases. *See Cont'l Cirs.*, 915 F.3d at 797 ("Phrases such as 'one technique,' 'can be carried out,' and 'a way' indicate . . . only one method for making the invention and does not automatically lead to finding a clear disavowal of claim scope."). This permissive language simply does not rise to the level of lexicography or disavowal that would be required to read the specification's examples into the claims.

Notably, after the passage lists potential materials for the dielectric layer, it then states that "***[a]ny suitable dielectric material could be used*** except films requiring processing at temperatures more than 650° C." Appx88, 7:20–22. Given the context of the passage, these statements together indicate that a skilled artisan had many options when implementing Watanabe's claimed invention. Indeed, that the specification says that "any suitable dielectric material could be used" for the

claimed semiconductor memory structure, with one specific exception, does not impose an independent requirement. Carved out from the broad universe of "[a]ny suitable dielectric material" are "***films*** requiring processing at temperatures more than 650° C." Appx88, 7:20–22. But the claims do not recite a temperature limit for its dielectric material and, more importantly, the specification's description of the material used for one layer of a structure cannot be extrapolated to require a temperature limit for the overall structure. Even if one were to use a film that does not ***require*** a processing temperature above 650° C, nothing in the specification precludes the overall structure to be bonded at a higher temperature. *See* Appx4148–49; Appx5315 (Trial Tr. 11:12–15).

The Board further resorted to citing extrinsic evidence out of context to support this temperature requirement. As an initial matter, extrinsic evidence is inherently less reliable than the intrinsic record. *See Cont'l Cirs.*, 915 F.3d at 790. Here, the Board relied on biased expert testimony to support its imported temperature requirement. Appx32. Patent Owner's expert Dr. Przybylski testified that bonding structures at temperatures over 900° C would severely impact the structures. Appx32 (citing Appx3757–58 ¶¶ 76–77). The Board also accepted Patent Owner's misstatement of Micron's expert testimony, in which Patent Owner argued that Micron's expert, Dr. Lee, stated in deposition that "the processing of the upper layer transistors cannot go above 650 degrees C." Appx29, Appx32 (citing

Appx3632–33 (Tr. 123:13–124:7)), Appx40. But Patent Owner and the Board viewed this testimony in isolation from Dr. Lee's surrounding testimony. During the same line of questioning, Dr. Lee explained that the proper consideration was actually a "thermal budget," defined by the product of time and temperature, not temperature alone. Appx3634 (Tr. 125:6–14). And both parties' experts agreed that both time and temperature are relevant factors in evaluating "thermal budget," which is shorthand for the total amount of thermal energy injected into a device. *See* Appx3634 (Tr. 125:6–14); Appx3755 ¶ 71. Put another way, a fabrication process that exposes a semiconductor device to a very high temperature for a brief period of time may be acceptable, while another process that requires prolonged exposure to a lower temperature may cause damage. *See* Appx3755 ¶ 71. This expert testimony does not support reading an absolute temperature requirement into the claims. Indeed, record evidence confirms that exposing a semiconductor device to 1005° C for 300 seconds would not cause damage. *See* Appx4729; Appx4731 (Fig. 4).

And even if Dr. Przybylski's testimony that a bonding temperature at 900–1000° C will always result in burned devices were correct (it is not), that does not change the broad scope of the claims. Indeed, if Dr. Przybylski were correct, he might have in hindsight drafted a different claim; one that was specifically limited to 650° C to avoid his concern regarding burning. But now, years after issue, Patent Owner cannot redraft its claims in this way. *See Chef Am., Inc. v. Lamb-Weston,*

*Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) (refusing to redraft claims directed to baking cookies that would result in the cookie dough "being burned to a crisp," noting: "Even a nonsensical result does not require the court to redraft the claims.").

The intrinsic and extrinsic evidence do not require a bonding temperature at or below 650° C in every possible scenario, and the Board erred in construing the bonding limitation to have this requirement. A plain reading of claim 13 reveals no temperature restrictions.

### C. The Board's erroneous construction tainted the rest of its analysis and is an independent basis for reversal.

The Board's claim construction error alone requires vacatur and remand. As explained in further detail below, the Board's subsequent conclusions are viewed from the lens of this improperly imported temperature requirement.

The Court dealt with a similar situation in *George M. Martin Co. v. Alliance Mach. Sys. Int'l LLC*, 618 F.3d 1294 (Fed. Cir. 2010). There, the court below considered whether prior art operated at "production speed." But there was no "production speed" requirement in the claims. *Id*. at 1302–03. The Court explained that for the device to be used as prior art, it must merely work as intended. It need not also satisfy unclaimed features:

> In this case, however, the record shows that the [prior art] machine did work, insofar as it was able to do what the preamble of claim 1 required . . . The [prior art] machine simply did not work at "production speed." As discussed, however, the claims do not require a threshold throughput or commercial speed.

*Id*. at 1303 (citation omitted).

Here, the Board essentially required Micron to prove that Watanabe's stacking technique would bond its layers at or below 650° C to avoid Dr. Przybylski's purported concern about burning the device. *See* Appx32 (citing Appx680, 4:35–38; Appx681, 6:6–14; Appx3756–57 ¶¶ 75–76). But as explained above, none of these are claim requirements. As in *George M. Martin,* the Board imposed a phantom temperature requirement, similar to the improper "production speed" requirement in "claims [that] do not require a threshold throughput or commercial speed." 618 F.3d at 1303. The Board's erroneous claim construction thus infected its view of the prior art, and caused it to reach conclusions that are arbitrary and capricious, not supported by substantial evidence, and which should be reversed.

## II. The Board erred by failing to consider Watanabe for all it teaches in view of the knowledge of a skilled artisan in an obviousness analysis, instead conducting an erroneous enablement analysis.

Micron showed that Watanabe taught all of the limitations of claim 13. Appx13–25. Watanabe's "invention relates to a semiconductor memory device," as required by claim 13's preamble. Appx14 (quoting Appx679, 1:10–11, 1:49–52). The Petition explained that Watanabe's stacking technique and laminating technique each taught element 13[a] because a skilled artisan would have understood that the figures related to these fabrication techniques disclosed "a substrate having electrical

devices formed therein, and further having a dielectric layer disposed above the electrical devices." Appx220–22 (citing Appx677–78 (Figs. 5–6)).

The Board construed "stackable add-on layer" to not "include memory cells that are formed by sequential deposition on or above a substrate without being added to a separately formed substrate." Appx12. Micron showed that under the Board's claim construction, Watanabe taught "a stackable add-on layer having a plurality of vertically oriented semiconductor memory cells" as recited by element 13[b]. Watanabe discloses "a 3-dimensional memory cell array" with memory cells at the cross points of planar members and wires, and the formation of memory cells with the transistors' source-channel-drain elements arranged vertically. Appx222–23 (citing Appx679–80, 1:49–52, 1:65–2:2, 2:11–13, 2:65–3:15, 4:7–9; Appx672–73 (Figs. 1, 2A); Appx377–79 ¶¶ 73, 74). Watanabe's stacking technique forms planar members separately fabricated that are then stacked and wired onto the substrate having the peripheral circuit and transistors. Appx224–25 (citing Appx681, 5:8–26, 5:52–55, 5:64–65; Appx678 (Fig. 6D)); *see also* Appx234–35 (explaining that Figure 7 discloses a "vertical transistor having a floating gate and a control gate"). And because each of Watanabe's planar members contains vertically oriented semiconductor memory cells, Watanabe taught element 13[b].

Then Micron addressed how Watanabe taught "the stackable add-on layer being bonded to the dielectric layer," as recited by claim element 13[c]. Appx227–

29. Watanabe taught that "switching elements (41 to 44) are each made of a conductive layer and an insulating layer which are layered between the conductive wires (23 to 26) and the planar members (21, 22)." Appx679, 1:59–64; *see also* Appx227–28 (quoting Appx680, 3:9–15). Consistent with the Board's claim construction, each planar member in Watanabe is formed separately from the peripheral circuit of Figure 6A. Appx228 (citing Appx678 (Fig. 6B)). Micron then explained that after the planar members are separately formed, they are stacked together and then bonded to the substrate of Figure 6A at 900° to 1000° C. Appx228 (citing Appx681, 6:6–8; Appx678 (Fig. 6C); Appx383–84 ¶¶ 81, 82).

In response to Patent Owner's argument that high temperature bonding "would have exceeded the thermal budget of the transistors embedded in the substrate . . . , thus damaging the transistors," Appx3404–05, Micron explained that a skilled artisan "would have understood how to perform Watanabe's stacking technique without exceeding thermal budget" by using a rapid heating technique, such as EMIH. Appx4159–60 (citing Appx4436 ¶ 70; Appx4547, 1:26–29, 1:40–43, 1:64–67; Appx4552; Appx4562). In his declaration, Micron's expert Dr. Lee testified that skilled artisans would have known how to "bond[] a structure (containing FETs) formed separately from the substrate to a dielectric layer can be achieved at 900–1000° C (as described in Watanabe) *without* exceeding the thermal budget—and, therefore avoiding damage to the lower memory cells—if the process

time is carefully controlled." Appx4414–15 ¶ 40 (citing Appx4726; Appx4728–29; Appx4731 (Table 1)). Under the plain meaning of the bonding limitation, which includes no recited temperature restriction, Watanabe's stacking technique thus taught claim element 13[c].

Finally, for claim element 13[d], which requires that the memory cells be "nonvolatile memory cells having at least one transistor," Micron explained how Watanabe states that its invention "is applicable to ***any type of memory device*** i.e., a SRAM, PROM, or a DRAM." Appx231 (quoting App679, 2:51–53) (emphasis added). Micron further explained that a skilled artisan would have understood PROM memory is nonvolatile memory. Appx231 (citing Appx386 ¶ 83). Micron also explained how a skilled artisan would have understood that the source, channel, drain, floating gate, and control gate of Figure 7 of Watanabe form a nonvolatile memory cell transistor. Appx231 (citing Appx681, 6:15–19; Appx386 ¶ 84).

Under the standard set forth by the Supreme Court in *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398 (2007), Micron demonstrated that claim 13 would have been obvious in view of Watanabe. But the Board did not properly consider the obviousness issues.

Instead, the Board concluded that Watanabe was not enabled and thus cut short the obviousness analysis. This short-circuit review of Micron's argument was erroneous for at least two additional and independent reasons (in addition to the

claim construction error discussed in Section I). First, even assuming Watanabe is not enabling (which is incorrect), the Board erred by failing to consider the knowledge of a skilled artisan in analyzing the obviousness argument applying Watanabe. If Watanabe itself was not enabled, Watanabe's teachings and other supporting evidence would nevertheless have enabled a skilled artisan to make the claimed subject matter of claim 13. And second, the Board's enablement conclusions are arbitrary and capricious, and unsupported by substantial evidence.

### A. The Board erred by failing to apply a proper obviousness analysis to Watanabe.

Even if Watanabe does not enable its own disclosures (which it is presumed to do, and indeed does), the Board was required to consider Watanabe under the correct obviousness framework.

The Supreme Court explained that "the question of obviousness" under 35 U.S.C. § 103 mandates "an expansive and flexible approach." *KSR*, 550 U.S. at 415. In rejecting the "assumption" that a skilled artisan would limit her search to "prior art designed to solve the same problem," the Supreme Court emphasized that a person of ordinary skill considering combinations or modifications is also equipped with her knowledge, common sense, and creativity when considering combinations or modifications to the prior art. *Id*. at 415–21. Thus, the knowledge of a skilled artisan in viewing prior art is vital to an obviousness inquiry. *See id*. at

421 (“A person of ordinary skill is also a person of ordinary creativity, not an automaton.”).

In arguing that Watanabe rendered claim 13 of the ’702 patent obvious, Micron explained that Watanabe’s stacking technique taught claim elements 13[a]–[c]. Appx220–30. In its Petition, Micron specifically relied on Watanabe’s “stacking” technique to teach “a stackable add-on layer having a plurality of vertically oriented semiconductor memory cells; and the stackable add-on layer being bonded to the dielectric layer.” *See* Appx222–30 (discussing claim elements 13[b]–[c]). Micron demonstrated that the “stacking” technique disclosed in the Watanabe reference was a viable and established technique for manufacturing semiconductor memory, supported by substantial record evidence. *See* Appx4159–60 (citing Appx4436 ¶ 70; Appx4547, 1:26–29, 1:40–43, 1:64–67; Appx4552; Appx4562).

However, the Board reasoned that “if an obviousness case is based on a non-self-enabled reference, ***and no other*** prior art reference or ***evidence would have enabled a skilled artisan to make the claimed invention***, then the invention cannot be said to have been obvious.” Appx29 (quoting *Raytheon Techs. Corp. v. Gen. Elec. Co.*, 993 F.3d 1374, 1377 (Fed. Cir. 2021)) (emphases added). The Board then applied *Raytheon* to end its review, but failed to actually consider the substantial

additional evidence that Micron presented regarding how one of skill in the art would have implemented Watanabe. This was error.

*Raytheon* is distinguishable. In *Raytheon*, a patent directed to gas turbine engines claimed an engine with a "power density" range that was "higher than in the prior art." 993 F.3d at 1377–78. A petitioner challenged the patent claims with a single-reference obviousness ground. *Id*. at 1378–79. As relevant here, the petitioner did not present any evidence to suggest that "a skilled artisan could have made" the claimed engine. *Id*. at 1382. Indeed, it was undisputed that there was no known material in existence that could have supported the claimed higher power density. *Id*. at 1378. Regardless, the Board held that the reference was enabling because it "provided enough information to allow a skilled artisan to '***determine*** a power density as defined'" by the claims, even if there was no known material that could actually ***implement*** devices that have such high power densities. *Id*. at 1379 (emphases added). This Court reversed because nothing in the prior art reference or record evidence demonstrated that the reference "enables a skilled artisan to make the claimed invention." *Id*. at 1380.

This Court explained that because there was an "absence of such other supporting evidence to enable a skilled artisan to make the claimed invention," "the reference must necessarily ***enable the relied-upon portion of its own disclosure***—the same standard applied to anticipatory references." *Id*. at 1381 (emphasis added).

In addressing the argument regarding whether the prior art could have been implemented, the Court explained, "[t]hat position may have carried the day if [the petitioner] had presented other evidence to establish that a skilled artisan could have made the claimed turbofan engine with the recited power density. But no such other evidence was presented." *Id*. at 1381–82. At bottom, there was simply nothing in the record that suggested there was any known material that could have been used to build the claimed device. *See, e.g.*, *Trustees of Bos. Univ. v. Everlight Elecs. Co.*, 896 F.3d 1357, 1362 (Fed. Cir. 2018) (holding claim was not enabled because "the specification d[id] not enable what the experts agree is physically impossible"); *In re Swartz*, 232 F.3d 862, 864 (Fed. Cir. 2000) (affirming examiner's enablement rejection of an application for a cold fusion invention). That is simply not the case here.

Here, the Board erred by determining there was no supporting evidence to enable a skilled artisan to make the alleged invention because the Board applied the "same standard applied to anticipatory references." *See Raytheon*, 993 F.3d at 1381. This was in error because unlike the petitioner in *Raytheon*, who presented no evidence beyond the single reference, Micron provided substantial evidence that a skilled artisan would have understood how to implement Watanabe's teachings at 900–1000° C for a short period of time and avoid damaging the transistors. For example, Micron's expert explained that a skilled artisan would have known about

rapid heating techniques, such as EMIH, capable of bonding multiple semiconductor layers at high temperatures in a short period of time to avoid thermal damage. *See* Appx4149 (citing Appx4915; Appx4820). Thus, unlike *Raytheon* where the record demonstrated that no known material could have enabled the claimed invention, the undisputed record here demonstrates that a person of skill in the art could have bonded semiconductor layers with a high temperature process using a known "thermal budgeting" approach that ensured the exposure to high temperature was brief. *See, e.g.*, Appx4412–17 ¶¶ 35–44; Appx4915; Appx4820; Appx4726; Appx4728–29; Appx4731. This is further supported by evidence confirming that exposure of a semiconductor device to 1005° C for 300 seconds would not cause damage. *See* Appx4729; Appx4731 (Fig. 4). But the Board did not consider this evidence because it cut short the obviousness inquiry by misapplying *Raytheon* to erroneously determine that Watanabe is not enabled.

Moreover, even if Watanabe itself did not contain sufficient description of how to implement its stacking technique—which Micron disputes—the Board was required to perform an obviousness analysis because Watanabe is prior art "for all that it teaches." *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551 (Fed. Cir. 1989); *see Symbol Tech., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1578 (Fed. Cir. 1991). The Board's analysis is thus arbitrary and capricious, and lacking substantial evidence because it did not apply the correct obviousness standard—a

standard that mandates the consideration of a skilled artisan's knowledge and common sense. The Board's decision should be vacated and remanded so that it can conduct a complete obviousness analysis as the law requires.

Further, the Board erred by placing a burden on Micron and its expert to specify a "length of time . . . in which Watanabe's stacked structures could be heated to 900–1000° C without irreparably damaging transistors 71 and 72 formed in Watanabe's silicon substrate." Appx34. Not only is this position based on the claim construction error set out in Section I above (*i.e.*, the claims recite no requirement for 650° C maximum temperature), it refuses to consider Micron's evidence that all of these considerations were well within the common knowledge of a skilled artisan at the time the invention was made.

In addition, the Board again focused its consideration of Watanabe on unclaimed features, and ignored other aspects of Watanabe that map onto the broad claims at issue. For example, in adopting the testimony of Dr. Przybylski (which was based on Watanabe's 100-plane example), the Board required Watanabe to heat a layer at 900° C 100 times. *See* Appx29–30; Appx3757–58 ¶¶ 76–77 (citing Appx680, 4:35–38 (100-plane example)). But, as with temperature, the claims contain no limitations that require more than one bonding step, *i.e.*, stacking more than one layer of memory cells onto a substrate. And the Board ignored Watanabe's teaching to heat *one* layer at 900 degrees *one* time. *See* Appx681, 5:45–6:14. As

Micron explained at the hearing, there is "no requirement on the number of stackable layers" to add on and "no evidence in the record that would indicate that adding one stackable add-on layer would exceed thermal budget." Appx5315 (Tr. 11:12–15). The Board legally erred by failing to consider whether Watanabe, in view of the other evidence of record, would have taught a skilled artisan to make and use such a one-stackable-add-on layer example, which is covered by the claim's broad language. *See* Appx4159–60; Appx4147–50; *see also Morsa II*, 803 F.3d at 1377 ("For a prior-art reference to be enabling, it need not enable the claim in its entirety, but instead the reference need only enable a single embodiment of the claim."). This too is an error because the Board's construction ignored evidence in the prior art based on an erroneously narrow view of the claims.

**B. The Board's conclusion that Watanabe was not enabling is erroneous.**

Watanabe enables its own disclosure, as shown by the record evidence. The record evidence demonstrates that a skilled artisan would have understood "how to perform Watanabe's stacking technique without exceeding thermal budget." *See* Appx4149 (citing Appx4436 ¶ 70; Appx4915; Appx4820). Micron provided examples of methods of "bonding a stack of silicon wafers . . . in a shorter time period than prior methods" to manage thermal budget while bonding at high temperatures. *See, e.g.*, Appx4412–17 ¶¶ 35–44; Appx4915; Appx4820; Appx4726; Appx4728–29; Appx4731. And Micron demonstrated that heating a semiconductor

device to 1005° C for 300 seconds would not cause damage. *See* Appx4729; Appx4731 (Fig. 4). Therefore, a skilled artisan would have known how to implement Watanabe's technique at a bonding temperature of 900–1000° C without destroying the transistors.

Prior art printed publications are presumed enabling. *In re Antor Media Corp.*, 689 F.3d 1282, 1288 (Fed. Cir. 2012); *see also Apple Inc. v. Corephotonics, Ltd.*, 861 F. App'x 443, 450 (Fed. Cir. 2021) ("[R]egardless of the forum, prior art patents and publications enjoy a presumption of enablement, and the patentee/applicant has the burden to prove nonenablement for such prior art."). This presumption may be overcome only if the patent owner "makes a non-frivolous argument that cited prior art is not enabling." *In re Morsa*, 713 F.3d 104, 110 (Fed. Cir. 2013).

When evaluating whether a prior art reference is enabled, one considers the teachings of the reference from the perspective of a person of ordinary skill in the art, as well as other evidence of record. *See id.*; *Raytheon*, 993 F.3d at 1380–81. A patent is enabling if "at the time of filing the application one skilled in the art, having read the specification, could practice the invention without 'undue experimentation.'" *Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1336 (Fed. Cir. 2013) (quoting *In re Wands*, 858 F.2d 731, 736–37 (Fed. Cir. 1988)); *see Amgen Inc. v. Sanofi*, 598 U.S. 594, 610, 612 (2023) ("[A] specification may call for a reasonable amount of experimentation to make and use a patented invention.").

Assessing whether undue experimentation is required often involves "weighing many factual considerations," known as the *Wands* factors, depending on the nature of the invention and underlying art. *See Cephalon*, 707 F.3d at 1336 (citation omitted).

Despite Micron demonstrating that a skilled artisan would have known how to manage thermal budget to bond wafers at a high temperature, the Board determined that Watanabe's stacking technique was not enabled. Appx36. But, as explained above in Section I, the Board improperly imposed a temperature requirement on which it based its conclusion that Watanabe was not enabled. *See* Appx35 (citing Appx88, 7:15–29). This is wrong and reversible error for the reasons already explained in Section I.

Moreover, whether *claim 13* requires a bonding temperature at or below 650° C has no bearing on whether *Watanabe itself* enabled its stacking technique within its own temperature range. *See Antor*, 689 F.3d at 1290 ("[A] prior art reference need not enable its full disclosure; it only needs to enable the portions of its disclosure alleged to anticipate the claimed invention."). As Micron explained, Watanabe does not require temperatures at or below 650° C and would have been successfully implemented by a skilled artisan using thermal budgeting approaches that were well known and within the level of skill at the time. *See* Appx4149 (citing Appx4436

¶ 70; Appx4915; Appx4820); Appx4412–17 ¶¶ 35–44; Appx4915; Appx4820; Appx4726; Appx4728–29; Appx4731.

Further, in finding Watanabe's temperature range too high to operate its stacking and bonding technique, the Board did not consider whether undue experimentation was required for a skilled artisan to enable Watanabe's stacking and bonding at 900–1000° C. *See Cephalon*, 707 F.3d at 1336 ("This [enablement] requirement is met when at the time of filing the application one skilled in the art, having read the specification, could practice the invention without 'undue experimentation.'" (quoting *Wands*, 858 F.2d at 736–37)); *Convolve, Inc. v. Compaq Comp. Corp.*, 527 F. App'x 910, 930 (Fed. Cir. 2013) (nonprecedential) ("Determining whether undue experimentation is necessary requires the weighing of many factual considerations."). The Board's enablement analysis both rejected evidence showing that high-temperature bonding could be done for a short time in consideration of a thermal budget, and also failed to consider whether undue experimentation would have been required to perform high-temperature bonding without exceeding thermal budget. Without actually considering the factual questions on enablement (*e.g.*, undue experimentation), the Board's ultimate legal conclusion as to enablement is unsupported by substantial evidence.

### C. The Board's treatment of the evidence is riddled with further errors.

In addition to these errors, the Board's treatment of the evidence is not based on substantial evidence.

For example, the Board relied on Patent Owner's expert Dr. Przybylski's testimony that bonding structures at temperatures over 900° C would severely impact the structures. Appx32. But Dr. Przybylski's testimony is based on Watanabe, concluding "each layer in Watanabe is individually bonded and wired, and Watanabe 'contemplate[s] bonding 100 layers, with 100 high-temperature bonding steps.'" Appx29 (citing Appx680, 4:35–38; Appx681, 6:6–14; Appx3756–57 ¶¶ 75–76). Indeed, Dr. Przybylski agreed that thermal budget requires a consideration of both time and temperature. Appx3755 ¶ 71. Thus, his testimony on thermal damage is premised on exceeding the thermal budget based on the combined heating from "100 high-temperature bonding steps." By adopting Dr. Przybylski's conclusion, the Board required Watanabe to enable up to *100* bonding steps. But both Dr. Przybylski and the Board ignored Watanabe's other teachings with only two layers. Patent Owner and the Board cite one but ignore the other. *See* Appx3757–58 ¶¶ 76–77 (Dr. Przybylski relying on Watanabe's 100-layer example); *compare* Appx680, 4:35–38 (Watanabe's example describing "a semiconductor structure which contains 100 data planes (or word planes) layered") *with* Appx681, 6:6–14 (discussing Figure 6C, which shows only two layers bonded on top of

substrate). The Board ignoring one embodiment within Watanabe without explanation was arbitrary and capricious. *See Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 970 (Fed. Cir. 2015) (vacating where the Board disregarded results of survey evidence without explanation).

Moreover, the Board made several fact findings that no reasonable factfinder could have reached in viewing the record evidence. Despite evidence showing that wafers could be safely bonded around 1000° C so long as the heating is kept to a short time, the Board treated Dr. Lee's testimony as "conclusory" because he did not estimate the thermal budget for Watanabe's stacking technique. Appx35. In view of the record evidence, no reasonable factfinder could have reached this conclusion after considering the explicit teaching that heating to 1000° C for five minutes is within "an allowed . . . region for temperature-time combinations" for heating. Appx4729; Appx4731 (Fig. 4); *see* Appx4413–18 ¶¶ 36–44.

Yet the Board deemed Watanabe's temperature range and Dr. Lee's isolated deposition statement so determinative that the Board dismissed all of that additional evidence—the knowledge of a skilled artisan based on the prior art evidence, and the further expert testimony of both Micron's and Patent Owner's experts. No reasonable factfinder could have concluded that Watanabe's bonding temperature was too high because the evidence showed that a person of skill in the art would

have known to use an appropriate thermal budget to determine an appropriate time to heat the components without burning the device.

To the extent that Patent Owner contends—through attorney argument only—that the solutions provided by the additional evidence do not show bonding with metal embedded in the wafers and that doing so would have burned the wafers, Micron countered those arguments with evidence and expert testimony that demonstrated bonding by those processes for wafers with pre-formed transistors. Micron's expert explained that at the time of the '702 patent, a skilled artisan would have known how to bond a structure containing field effect transistors (FETs) "formed separately from the substrate to a dielectric layer" and how to achieve that bonding "at 900–1000°C (as described in Watanabe) without exceeding the thermal budget . . . if the process time is carefully controlled." Appx4414–15 ¶ 40 (citing Appx4726; Appx4728–29; Appx4731 (Table 1)). For example, Figure 4 of the Regner paper shows "allowed" and "forbidden" regions for temperature-time combinations of the anneal step after source-drain implantation with the temperature-time combination of 1005° C for 300 seconds in the allowable region. *See* Appx4729; Appx4731 (Fig. 4).

No reasonable factfinder could have reached the same conclusion as the Board in view of the evidence showing that high-temperature bonding of semiconductor layers for a short period of time was known to a skilled artisan. The Board reached

these conclusions by applying improper claim constructions during its analysis, and simply ignoring other evidence that does not support its conclusions. *See Aqua Prods., Inc. v. Matal*, 872 F.3d 1290, 1325 (Fed. Cir. 2017) ("[A]n agency's refusal to consider evidence bearing on the issue before it is, by definition, arbitrary and capricious within the meaning of 5 U.S.C. § 706, which governs review of agency adjudications."). Such determinations lack substantial evidence.

## III. The Board's disregard of Micron's arguments regarding nonvolatile memory as new was an abuse of discretion; its failure to consider Watanabe for all that it teaches was arbitrary and capricious; and its application of Watanabe to claim elements 13[a]–[c] lacks substantial evidence.

As explained above, Micron relied on Watanabe for its teaching of a semiconductor memory device and related manufacturing techniques as applied to nonvolatile memory. Appx13–25.

The Board, however, concluded that Micron's reliance on Watanabe as teaching nonvolatile memory was an improper new argument made in reply. The Board determined that "even if Petitioner's new argument were considered," Micron relied only on Watanabe for its DRAM teachings and therefore failed to demonstrate that Watanabe taught claim elements 13[a]–[c] of the '702 patent. Appx26–28. The Board's decision is erroneous for three reasons. First, Micron's reply argument was a permissible reply argument, and the Board abused its discretion in deeming it new. Second, the Board failed to consider Watanabe for all that it teaches. Third, the

Board misconstrued Micron's arguments as limited to Watanabe's DRAM teachings, but no reasonable factfinder could have so concluded.

### A. The Board abused its discretion in concluding that Micron's reply arguments addressing Watanabe's nonvolatile memory teaching were new and should be ignored.

The Petition applied Watanabe's teachings as they relate to a semiconductor device to each element of claim 13. Micron asserted that Watanabe's fabrication techniques were applicable to nonvolatile memory from the start. The Petition states:

> Watanabe discloses, "The memory cell of the present invention is applicable to any type of memory device i.e., a SRAM, PROM, or a DRAM . . .
> Watanabe further discloses, "An application of the present invention into an EPROM is illustrated in FIG. 7."

Appx231 (quoting Appx679, 2:51–53; Appx681, 6:15–19). In its response, Patent Owner argued that "the Petition solely relies on Watanabe's volatile DRAM memory" and that Micron was trying to combine Watanabe's volatile and nonvolatile embodiments. Appx3400–01. Micron responded to Patent Owner's characterization and explained that Micron was not combining embodiments—Watanabe expressly teaches that "[t]he memory cell of the present invention is applicable to any type of memory device." Appx679, 2:51–53. This would have included, for example, EPROM nonvolatile memory as depicted in Figure 7. Appx4156–58. Watanabe's Figures 1–5 are also "applicable to any type of memory device i.e. a SRAM, PROM, or a DRAM," which specifically includes a type of

nonvolatile memory (PROM). Accordingly, Figure 7 is not a "new embodiment"; it is simply another example of the principle that all of Watanabe's teachings could be applied to any type of memory device, including nonvolatile memory like PROM and EPROM. Appx679, 2:51–53.

From the start, Micron asserted that Watanabe's fabrication techniques were applicable to nonvolatile memory. Appx231 (quoting Appx679, 2:51–53; Appx681, 6:15–19). However, the Board erroneously concluded that Micron's reply arguments were "new." Appx27–28. "[A] reply may be proper if it is responsive and simply expands on previously raised arguments." *Rembrandt Diagnostics, LP v. Alere, Inc.*, 76 F.4th 1376, 1384 (Fed. Cir. 2023); *see also Chamberlain Grp., Inc. v. One World Techs., Inc.*, 944 F.3d 919, 925 (Fed. Cir. 2019) ("Parties are not barred from elaborating on their arguments on issues previously raised."). The Court has warned against parsing "arguments on reply with too fine of a filter." *Ericsson Inc v. Intell. Ventures I LLC*, 901 F.3d 1374, 1380 (Fed. Cir. 2018).

The Board cited *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016), in support of its refusal to consider Micron's reply. In that case, the improper reply referenced new evidence—specifically, non-patent literature "necessary to make out a prima facie case for the . . . unpatentability" of a claim that was not mentioned in the IPR petition. And in *Ariosa Diagnostics v. Verinata Health, Inc.*, this Court affirmed the Board's rejection of a reply that relied

on parts of a reference that were not previously identified or discussed in the petition. 805 F.3d 1359, 1367–68 (Fed. Cir. 2015). Neither situation applies to the facts in this case.

The Petition presented Watanabe's fabrication techniques in view of Watanabe's broad applicability to "any type of memory device," including EPROM nonvolatile memory. Then on reply, Micron simply responded to Patent Owner's attempts to misstate Watanabe's teachings and undercut Patent Owner's rationale. Micron added nothing new in its reply. The circumstances here are comparable to those in *Ericsson v. Intellectual Ventures*, 901 F.3d at 1374. There, the patent owner argued for the first time in its response that one of the cited prior art references did not teach the specific type of "interleaving" data packet recited by the challenged claims. *Id*. at 1378. The petitioner had argued in its reply that the specification of the challenged patent stated that "interleaving" was known in the art and that the difference in the interleaving data packet types was "insubstantial at best." *Id*. at 1379. The Board rejected the reply argument as an improper new theory. *Id*. On appeal, this Court held that the Board had abused its discretion in rejecting the reply argument. *Id*. at 1381. The Court explained that the reply argument did not "constitute an entirely new rationale" because both the petition and challenged patent described how a skilled artisan was familiar with interleaving and that the reply arguments (that there was very little difference between interleaving R-blocks

within S-blocks and interleaving S-blocks with S-blocks) "expressly follow from the[] contentions raised in the Petition." *Id*. at 1380–81.

Likewise, Micron's reply "expressly follow[s] from the[] contentions raised in the Petition," and relied on the same teachings from the same prior art reference to support the same legal argument—that Watanabe taught every limitation of claim 13 of the '702 patent. *Id*. at 1380; *see Apple v. Andrea*, 949 F.3d at 706. Directly responsive to Patent Owner's attacks on Watanabe's embodiments and characterization of Micron's arguments (*see* Appx2981–82; Appx2985–90; Appx3400–01), Micron explained that its Petition relied on Watanabe as applied to any type of memory, including nonvolatile memory. *See, e.g.*, Appx3234; Appx4156–58. These replies were responsive to Patent Owner's characterizing Watanabe's teachings as limited to DRAM. A reply argument first presented in the petition and responsive to Patent Owner's response cannot be a "new theory" later or impose an "unfair surprise" on Patent Owner. The Board therefore abused its discretion in holding that this argument was new and refusing to consider it.

### B. The Board's failure to consider Watanabe for all that it teaches was arbitrary and capricious.

As explained above, Watanabe's teachings are not limited to DRAM. Watanabe's teachings are applicable to non-volatile memory. Micron noted this fact in its Petition. Appx215 (quoting Appx679, 2:51–53); Appx231 (quoting Appx679, 2:51–53). Micron argued that Watanabe broadly applies to "any type of memory,"

including nonvolatile memory like "PROM" and "EPROM." Appx215; Appx231. And a skilled artisan would have understood Watanabe's teachings to apply to nonvolatile memory. Appx231 (citing Appx386 ¶ 83); *see also* Appx327, 2:4–9 (the '702 patent stating its applicability to DRAM and "non-volatile" memory cells).

Micron relied on Figures 1, 2A, and 5–6 to analyze claim elements 13[a]–[c] as applied to "any type of memory." For example, for element 13[b], Micron walked through the fabrication of Figures 5 and 6 to illustrate Watanabe's technique for making a separately fabricated stackable add-on layer having vertically oriented semiconductor memory cells, like that of Figure 2A. Appx224. Micron's citation to Figure 7 further evidences a skilled artisan's understanding that Watanabe applies to nonvolatile memory, and is not limited to DRAM. *See* Appx227. And Micron's expert Dr. Lee testified that a skilled artisan would have known how to implement the fabrication techniques shown in Watanabe's figures "to make an EPROM memory cell." *See* Appx4433 ¶ 65. At no point did Micron limit Watanabe to the DRAM embodiment.

Micron argued that Watanabe taught element 13[b] because Watanabe discloses both semiconductor memory cells with vertically-oriented transistors' source-channel-drain elements arranged vertically and a stacking technique to manufacture a stackable add-on layer having a plurality of vertically oriented semiconductor memory cells. Appx222–26. Next, Micron argued Watanabe taught

element 13[c] because Watanabe's stacking technique relies on separately fabricated planar members that are then bonded to the substrate. Appx227–29. Finally, Micron argued that Watanabe teaches "that the memory cells are nonvolatile" as required by element 13[d] because Watanabe explicitly states "[t]he memory cell of the present invention is applicable to any type of memory device," such as a type of non-volatile memory known as "PROM." Appx230.

Here, the Board acted arbitrarily and capriciously by not applying Watanabe for all that it teaches as required for an obviousness analysis. *See In re Mouttet*, 686 F.3d 1322, 1331 (Fed. Cir. 2012). The Board's disregard of Watanabe's teaching as applied to "any type of memory," including nonvolatile memory, "violates the principle that 'a reference must be considered for *everything it teaches* by way of technology and is not limited to the particular *invention* it is describing and attempting to protect.'" *Belden*, 805 F.3d at 1076 (quoting *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907 (Fed. Cir. 1985) (emphases in *Belden*)).

The Board erred by requiring Micron to explain how EPROM would be implemented to replace the DRAM cell in Figures 1, 2A, and 5–6. In making its obviousness challenge, Micron was not required to argue whether a reference's embodiments "could be physically combined" because the test is whether the "teachings of the prior art as a whole" rendered the claim limitations obvious. *In re Etter*, 756 F.2d 852, 859 (Fed. Cir. 1985) (en banc); *see also Allied Erecting &*

*Dismantling Co. v. Genesis Attachments, LLC*, 825 F.3d 1373, 1381 (Fed. Cir. 2016). Regardless of whether Watanabe's figures were understood to be limited to DRAM, Watanabe undisputedly explains that its teachings are applicable to all types of memory, including PROM nonvolatile memory. Appx679, 2:51–53; *see Uber Techs., Inc. v. X One, Inc.*, 957 F.3d 1334, 1341 (Fed. Cir. 2020) (reversing Board decision when the teachings of prior art, viewed as a whole, rendered obvious the claimed invention). Thus, the Board was arbitrary and capricious for not viewing Watanabe for all that it teaches.

### C. The Board's finding that Watanabe's teachings were confined to DRAM lacks substantial evidence support.

Watanabe expressly states that although its description incorporates a DRAM for the memory cell, its teachings were "applicable to any type of memory device i.e., a SRAM, a PROM, or a DRAM." Appx679, 2:51–55. For example, Figure 7 shows "[a]n application of the present invention into an EPROM," a form of nonvolatile memory. Appx681, 6:15–19. It is undisputed that PROM and EPROM are nonvolatile memory. Consistent with Watanabe's disclosure, Micron argued Watanabe's "semiconductor memory device," and its "stacking" or "laminating" techniques as applied to an exemplified nonvolatile device teach elements 13[a]–[c]. Appx2211–52.

The Board determined that Watanabe does not teach elements 13[a]–[c] because the relied-upon Figures 1–2 and 5–6 were limited to DRAM. *See* Appx27,

Appx36. But the bonding techniques taught in Watanabe's figures were not dependent on the type of memory being bonded. Rather, Watanabe explicitly states that its teachings are "applicable to any type of memory device," including a type of non-volatile memory called "PROM." That Watanabe depicted the memory cell in Figures 1–6 "as incorporated in a DRAM" was nonlimiting—that depiction was merely an example. Appx679, 2:51–55. No reasonable factfinder could have concluded the bonding techniques were limited to DRAM—to the contrary, Watanabe stated its broad applicability.

In view of Watanabe's clear statement that its teachings are applicable to "all memory types," no reasonable mind would have limited Watanabe's teachings to DRAM. Thus, the Board's findings for elements 13[a]–[c] are not supported by substantial evidence.

## IV. The Board erred by not applying a flexible approach in its motivation-to-combine analysis for claims 13–15 in view of Lee and Watanabe, as required by *KSR*.

In its Petition, Micron also argued that claims 13–15 are obvious over Lee in view of Watanabe. Appx275–79. Micron specifically argued that Lee taught manufacturing a semiconductor device, including nonvolatile memory, with vertically-oriented memory cells. Appx276 (citing Appx2519–23, 5:28–56, 11:18–32, 13:32–38); Appx277. Micron then argued that although Lee did not teach

bonding "stackable add-on layers" under the claim construction the Board ultimately adopted, Watanabe taught this element with its stacking technique. Appx277–78.

Micron presented numerous rationales as to why a skilled artisan would have been motivated to combine Lee with Watanabe. Appx275–79. Micron first explained that Lee and Watanabe are "from the same field and relate to the same well-known issues." Appx275. Micron then argued that Lee and Watanabe provided "complementary solutions for arranging memory cells three-dimensionally to provide a high integration density." Appx275. Next, Micron explained how a skilled artisan would have found it obvious to combine Lee with Watanabe because although both Lee and Watanabe disclose fabrication by sequential deposition, Watanabe offers an alternative stacking technique that a skilled artisan would have used to obtain the benefits associated with separately-fabricated stackable add-on layers and substrate. Appx276. Finally, Micron argued that Watanabe discloses that using its stacking technique "improves the accuracy of the wiring." Appx277 (quoting Appx681, 5:64–6:3).

But the Board concluded that Micron did not "explain sufficiently how Watanabe's stacking technique would improve Lee's device"; "address whether the alleged wiring benefit already existed in Lee's monolithic array"; or "explain how this benefit would also apply to Lee's particular memory array." Appx41. The Board further reasoned that improving "integration density" was not a "sufficient rationale"

for combining Lee's memory device and Watanabe's stacking technique, and Watanabe's bonding temperature of 900–1000° C would damage Lee's device. Appx41–42. Then, the Board explained that "[t]he expected damage to Lee's device . . . outweighs the reason to combine Lee and Watanabe set forth in the Petition." Appx42.

The Board's analysis is at odds with *KSR* and this Court's decisions in *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373 (Fed. Cir. 2023) and *Provisur Techs., Inc. v. Weber, Inc.*, 50 F.4th 117 (Fed. Cir. 2022). *KSR* requires an expansive and flexible approach when assessing obviousness and, as such, "any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason" to combine. 550 U.S. at 420; *see id*. at 417 ("[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond that person's skill."). Likewise, "[t]he motivation-to-combine analysis is a flexible one." *Intel v. PACT*, 61 F.4th at 1379. If there is a "known technique to address a known problem using 'prior art elements according to their established functions,' then there is a motivation to combine." *Id.* at 1380 (quoting *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 799–800 (Fed. Cir. 2021)). A party is not required to show an improvement in combining prior art references in a "categorical sense" in order to show a motivation

to combine. *Id*. at 1381. And *Provisur* explains that it is error for the Board to "not substantively engage" with a petition's argument. *See* 50 F.4th at 125.

The Board made two errors in assessing the motivation to combine Lee and Watanabe. First, the Board erred by inflexibly applying Watanabe to Lee without regard for the knowledge of a person of skill in the art. Second, the Board erred by requiring Micron to identify a specific improvement to the Lee reference that would result from the combination with Watanabe.

### A. The Board erroneously analyzed the motivation to combine Lee and Watanabe by disregarding the knowledge of a skilled artisan.

The Board reasoned that "the evidence shows that one of ordinary skill in the art would have expected Watanabe's bonding temperature of 900–1000° C to damage the electronic devices in an underlying substrate" and therefore the "expected damage to Lee's device . . . outweighs the reason to combine Lee and Watanabe set forth in the Petition." Appx42.

The Board's reasoning illustrates a rigid reading of Watanabe as applied to Lee. The Board was to analyze the motivation to combine Lee and Watanabe in view of what a skilled artisan would have known. *See KSR*, 550 U.S. at 418. By ignoring evidence showing "the knowledge and perspective of one of ordinary skill in the art, the Board failed to account for critical background information that could easily explain why an ordinarily skilled artisan would have been motivated to combine or

modify the cited references to arrive at the claimed inventions." *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013) (citing *KSR*, 550 U.S. at 415–22).

In response to Patent Owner's arguments that Watanabe's high-temperature bonding would damage Lee's memory device, Micron explained that the proper consideration was thermal budget, which both experts agreed was a function of temperature and time. Appx4147 (citing Appx3634 (Tr. 125:6–14); Appx3755 ¶ 71; Appx4712). Micron argued and presented supporting evidence that a skilled artisan would have known how to use a thermal budget to determine the length of time to bond the layers at Watanabe's bonding temperature without burning Lee's device. *See* Appx4148–49 (citing Appx4412–17 ¶¶ 35–44; Appx4726; Appx4728–29; Appx4731 (Table 1); Appx4547, 1:26–29, 1:40–43, 1:64–67; Appx4800–01; Appx4820; Appx4552; Appx4915). For example, a skilled artisan would have recognized that EMIH is a known way to bond a stack of wafers "in a shorter time period than prior methods." Appx4547, 1:26–29, 1:40–43, 1:64–67; Appx4800–01; Appx4820. Similarly, a skilled artisan would have known how to bond multiple layers all at once without exceeding the thermal budget. Appx4149 (citing Appx4417 ¶ 44; Appx4915; Appx4820). The Board's "failure to consider the knowledge of one of skill in the art appropriately" was error. *See Randall Mfg.*, 733 F.3d at 1363 (holding that the Board's finding a lack of motivation to combine was "infected by prejudicial error" when it failed to consider that a skilled artisan would

have modified a prior art reference using a stowing method "that was very familiar in the industry"); *Intel v. PACT*, 61 F.4th at 1380. Because the Board's finding no motivation to combine was based on a legal error, vacatur and remand are required.

### B. The Board erroneously required Micron to show a specific motivation to improve the Lee reference based on a particular benefit from Watanabe.

In its motivation-to-combine analysis, the Board stated that Micron did not "explain sufficiently how Watanabe's stacking technique would improve Lee's device." Appx41. While the Board addressed Micron's argument about "improved integration density" from the combination of Lee and Watanabe, the Board should have also considered whether Micron showed a motivation to combine Lee with Watanabe "independent of whether a skilled artisan would [have] recognize[d] any benefit in making the proposed combination." *Cisco Sys., Inc. v. K.Mizra LLC*, No. 2022-2290, 2024 WL 3841809, at *4 (Fed. Cir. Aug. 16, 2024) (nonprecedential); *Intel v. PACT*, 61 F.4th at 1380; *Provisur*, 50 F.4th at 125.

No specific motivation is necessary when there is a finite number of solutions and these solutions would have been obvious to try. In *CRFD Research, Inc. v. Matal*, this Court addressed whether a motivation to combine existed where a prior art reference offered one of two solutions. 876 F.3d 1330 (Fed. Cir. 2017). The claim-at-issue required transmitting a session history *after* a session was discontinued, but the prior art reference disclosed transmitting the session history

*before* a session was discontinued. *Id*. at 1334, 1346. The Board had concluded that the petitioner had "failed to provide a sufficient reason for why a person of ordinary skill in the art would have modified the sequence of operations" in that prior art reference. *Id*. at 1345 (quotations omitted). This Court reversed, explaining that "a person of ordinary skill would have two predictable choices" in view of the prior art—either transmit after discontinuing the session or before discontinuing the session. These alternatives thus "provid[ed] a person of ordinary skill with a simple design choice" between the two options to meet the goal of preserving an entire session history. *See id*. at 1347 (citing *KSR*, 550 U.S. at 421).

Here, both Lee and Watanabe disclose a fabrication technique using sequential deposition. Watanabe further describes an alternative stacking technique. Under *KSR*, *Intel*, and *CRFD Research*, because there are a finite number of predictable alternatives—here, just two—there is a motivation to combine Lee with Watanabe. A skilled artisan would have "two predictable choices" for fabricating a semiconductor layer in view of Watanabe—stacking separately fabricated memory layers or sequential deposition. *See CRFD Research*, 876 F.3d at 1347.

## CONCLUSION

For all the reasons explained, Micron respectfully requests that the Board's decision as to claims 13–17 of the '702 patent be vacated and remanded.

Respectfully submitted,

*/s/ John Kappos*

JOHN KAPPOS
O'MELVENY & MYERS LLP
2801 NORTH HARWOOD ST., STE. 1600
DALLAS, TX 75201
(972) 360-1900

XIN-YI ZHOU
BENJAMIN HABER
O'MELVENY & MYERS LLP
400 SOUTH HOPE STREET, 19TH FLOOR
LOS ANGELES, CA 90071
(213) 430-6000

WILLIAM FINK
KHANH LEON
O'MELVENY & MYERS LLP
1625 EYE STREET, NW
WASHINGTON, DC 20006
(202) 383-5300

*Attorneys for Appellants Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas, LLC*

April 7, 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Federal Circuit Rule 32(b)(1). This brief contains 13,406 words, excluding the portions of the brief exempted by Fed. R. App. P. 32(f). I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

April 7, 2025

Respectfully submitted,

*/s/ John Kappos*

*Attorney for Appellants Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas, LLC.*

# ADDENDUM

# INDEX TO THE ADDENDUM


| | |
|---|---|
| Appx1 – Appx49 | Final Written Decision |
| Appx50 – Appx90 | U.S. Patent No. 7,378,702 |

Trials@uspto.gov
571-272-7822

Paper 35
Date: November 13, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

MICRON TECHNOLOGY, INC.,
MICRON SEMICONDUCTOR PRODUCTS, INC., and
MICRON TECHNOLOGY TEXAS, LLC,
Petitioner,

v.

BESANG INC.,
Patent Owner.

---

IPR2023-00900
Patent 7,378,702 B2

---

Before JON B. TORNQUIST, KIMBERLY McGRAW, and
ELIZABETH M. ROESEL, *Administrative Patent Judges.*

TORNQUIST, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*
Denying-in-Part and Dismissing-in-Part
Patent Owner's Motion to Strike
*37 C.F.R. § 42.71*

# I. INTRODUCTION

Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas, LLC ("Petitioner") filed a Petition (Paper 1, "Pet.") requesting an *inter partes* review of claims 13–17 of U.S. Patent No. 7,378,702 B2 (Ex. 1001, "the '702 patent"). BeSang Inc. ("Patent Owner") filed a Preliminary Response to the Petition. Paper 6. We instituted review with respect to all grounds and claims set forth in the Petition. Paper 9 ("Institution Decision" or "Inst. Dec."). After institution, Patent Owner filed a Response (Paper 18, "PO Resp."), to which Petitioner filed a Reply (Paper 20, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 26, "Sur-reply").

Petitioner relies, *inter alia*, upon two declarations from Dr. Jack C. Lee, Ph. D. (Ex. 1002 (original declaration); Ex. 1041 (reply declaration)), and Patent Owner relies upon a declaration from Steven A. Przybylski, Ph.D. (Ex. 2029).

Patent Owner filed a Motion to Strike (Paper 24, "Motion" or "Mot."), to which Petitioner filed an Opposition (Paper 25, "Opp.").

An oral hearing was held on August 22, 2024, and a transcript of the hearing is included in the record (Paper 34, "Tr.").

For the reasons that follow, we conclude that Petitioner has not demonstrated by a preponderance of the evidence that claims 13–17 of the '702 are unpatentable on any asserted ground set forth in the Petition.

# II. BACKGROUND

## *A. Related Matters*

The parties identify the following district court proceeding as a related matter: *BeSang Inc. v. Micron Tech., Inc.*, No. 2:23-cv-00028 (E.D. Tex.).

Pet. 1; Paper 3, 1. Patent Owner also identifies *BeSang Inc. v. Intel Corp.*, No. 3:23-cv-00113 (D. Or.) as a related matter. Paper 3, 1.

*B. Real Parties in Interest*

Petitioner identifies itself (the three parties identified in the caption) as the real party in interest. Pet. 1.

Patent Owner identifies itself as the real party in interest. Paper 3, 1.

*C. The '702 patent*

The '702 patent is titled "Vertical Memory Device Structures" and issued May 27, 2008, from an application filed September 3, 2004, which is a continuation-in-part of an application filed June 21, 2004. Ex. 1001, codes (22), (45), (54), (63).

The '702 patent explains that "integrated circuits contain transistors that are primarily implemented on a single major surface of a substrate, such as a semiconductor wafer." Ex. 1001, 1:27–30. "These laterally oriented devices," however, "consume significant amounts of chip area." *Id.* at 1:30–31. The '702 patent explains that one method of reducing the lateral area consumed by the transistors was to reduce the lateral dimensions of the transistors and interconnects, but the equipment and technology needed to support the manufacture of such chips "becomes increasingly expensive with each new generation of smaller devices." *Id.* at 1:31–39. To address this problem, the '702 patent discloses the use of "a plurality of vertically oriented semiconductor memory devices, or cells," that "may be added to a separately fabricated substrate that includes electrical devices and/or interconnect lines." *Id.* at 1:40–50; *see id.* at code (57) ("Vertically oriented semiconductor memory cells are added to a separately fabricated substrate that includes electrical devices and/or interconnect.").

Figure 1 of the '702 patent is reproduced below:

Fig. 1




Figure 1 is a cross-sectional view of an embodiment that includes "a base semiconductor substrate and add-on vertical memory devices." Ex. 1001, 2:13–15. As shown in Figure 1, vertical memory devices 656 are separated by isolation 135 and have floating structures in filled dielectric materials 133*a*. *Id.* at 5:18–21. These vertical memory devices are referred to in the '702 patent as floating devices (FLD). *Id.* at 5:21–22. Inter-layer dielectric (ILD) layers 133 are disposed above and below FLD layer 101. *Id.* at 5:29–32. Interconnect lines 132 and vias 131 connect FLDs directly or indirectly within an FLD layer, or to another FLD layer, or to a base substrate. *Id.* at 5:32–36.

In the embodiment shown in Figure 1, base substrate 103 is bonded to lower dielectric layer 151. Ex. 1001, 5:37–38. Dashed line 134 denotes a border, or interface, between two ILD layers. *Id.* at 5:43–44. First ILD layer 151 has interconnections and vias, and base substrate 103 shares these interconnections and vias with first FLD layer 101. *Id.* at 5:44–47. The bottom of the FLD layer is connected to metal layer 121, which is also directly connected to vias 131 in ILD layer 151, thereby forming a preformed electrode and contact. *Id.* at 6:35–38. The top of the FLD layer may be connected to metal layer 122, which is also directly connected to vias 131 in ILD layer 152. *Id.* at 6:38–40. The ’702 patent notes that multiple FLD layers can be stacked, thereby increasing the effective device density. *Id.* at 6:41–42; *see also id* at 5:38–41, 5:47–50 (disclosing a “second FLD layer” not shown in Figure 1).

According to the ’702 patent, “[t]he plurality of vertically oriented semiconductor memory cells can be added to the separately fabricated substrate as a thin layer including several doped semiconductor regions which, subsequent to attachment, are etched to produce individual doped stack structures.” Ex. 1001, code (57), 1:57–62. “Alternatively, the plurality of vertically oriented semiconductor memory cells may be completely fabricated prior to attachment” to the separately fabricated substrate. *Id.* at code (57), 1:67–2:3.

The ’702 patent explains that the “FLDs may, but are not required to, have a pillar structure.” Ex. 1001, 6:43. The FLD of the ’702 patent also “has a gate dielectric layer which may be implemented with process operations at temperatures below 650° C.” *Id.* at 7:15–17, 7:20–22 (“Any

suitable dielectric material could be used except films requiring processing at temperatures more than 650° C.”).

*D. Illustrative Claim*

Petitioner challenges claims 13–17 of the ’702 patent. Pet. 3–4. Independent claim 13, reproduced below, is illustrative of the challenged claims:

> 13. A semiconductor memory structure, comprising:
>
> [a] a substrate having electrical devices formed therein, and further having a dielectric layer disposed above the electrical devices;
>
> [b] a stackable add-on layer having a plurality of vertically oriented semiconductor memory cells; and
>
> [c] the stackable add-on layer being bonded to the dielectric layer; and
>
> [d] wherein the memory cells are nonvolatile memory cells having at least one transistor.

Ex. 1001, 12:24–34 (paragraph identifications [a]–[d] are added to align with the parties’ arguments).

*E. Asserted Grounds of Unpatentability*

Petitioner asserts that claims 13–17 of the ’702 patent are unpatentable in view of the following grounds (Pet. 3–4):

| Claim(s) Challenged | 35 U.S.C. §[1] | Reference(s)/Basis |
|---|---|---|
| 13 | 103(a) | Watanabe[2] |
| 14–17 | 103(a) | Watanabe, Endoh[3] |
| 13–15 | 103(a) | Lee[4] |
| 16, 17 | 103(a) | Lee, Endoh |
| 13–15 | 103(a) | Lee, Watanabe |
| 16, 17 | 103(a) | Lee, Watanabe, Endoh |

## III. ANALYSIS

*A. Legal Standard*

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and “the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.” *KSR Int’l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying

[1] The Leahy-Smith America Invents Act (“AIA”), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), amended 35 U.S.C. § 103, effective March 16, 2013. The ’702 patent issued May 27, 2008. Ex. 1001, code (45). Accordingly, we apply the pre-AIA version of § 103. *See* 35 U.S.C. § 100(i)(1)(B).

[2] US 5,091,762, issued February 25, 1992. Ex. 1005 (“Watanabe”).

[3] US 2002/0154556 A1, published October 24, 2002. Ex. 1006 (“Endoh”).

[4] US 6,881,994 B2, filed August 13, 2001, and published April 19, 2005. Ex. 1007 (“Lee”).

factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective evidence of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

### *B. Level of Ordinary Skill in the Art*

The parties agree that one of ordinary skill in the art "would have had a bachelor's degree in electrical engineering, computer engineering, or a related field, and at least two years of experience in the research, design, or development of semiconductor memory device structures, or the equivalent, with additional education substituting for experience and vice versa." Pet. 8; PO Resp. 12; Ex. 1002 ¶ 34; Ex. 2029 ¶¶ 33–37.

### *C. Claim Construction*

In this proceeding, the claims of the '702 patent are construed "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. [§] 282(b)." 37 C.F.R. § 42.100(b). Under that standard, the words of a claim are generally given their "ordinary and customary meaning," which is the meaning the term would have had to a person of ordinary skill at the time of the invention, in the context of the entire patent including the specification. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc).

Upon review of the prior art and the parties' arguments, we determine that only the term "a stackable add-on layer" requires express construction. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) ("[O]nly those terms need be

construed that are in controversy, and only to the extent necessary to resolve the controversy.”)).

“*stackable add-on layer*”

Claim 13 requires “a stackable add-on layer having a plurality of vertically oriented semiconductor memory cells,” that is “bonded to the dielectric layer.” Ex. 1001, 12:29–32. Petitioner contends that Patent Owner’s district court complaint appears to interpret this claim term to cover forming the “stackable add-on layer” by sequential deposition directly on the substrate, but argues the intrinsic record of the ’702 patent does not support such a construction. Pet. 6 n.2 (citing Ex. 1019 ¶¶ 71–76). According to Petitioner, “a stackable add-on layer having a plurality of vertically oriented semiconductor memory cells” and “the stackable add-on layer being bonded to the dielectric layer” in combination require “vertically oriented semiconductor memory cells” to be formed in a separately fabricated “stackable add-on layer,” which is then “bonded [to] the dielectric layer.” *Id.* at 13 n.3.

In the Institution Decision, we preliminarily construed “stackable add-on layer” to be “a layer that is formed separately from the substrate and then bonded as [a] whole to the dielectric layer positioned above the substrate.” Inst. Dec. 9. We further noted that “[w]e do not understand a ‘stackable add-on layer’ to include memory cells that are formed by sequential deposition on or above a substrate without being added to a separately formed substrate.” *Id.*

Petitioner “agrees in substance” with our preliminary construction but would modify the construction to be “a ~~layer~~ structure ~~that is~~ formed separately from the substrate ~~and then~~ suitable to be bonded ~~as whole~~ to the

dielectric layer positioned above the substrate." Pet. Reply 4. Petitioner also agrees that a "stackable add-on layer" should not be read to include memory cells formed by sequential deposition without being added to a separately formed substrate. *Id.*

Patent Owner contends our preliminary construction "is incorrect" but does not explain why and does not provide its own construction of this term. PO Resp. 13. Rather, Patent Owner contends "the Board may confirm the patentability of the Challenged Claims for reasons unrelated to 'stackable add-on layer.'" *Id.*; *see also* Sur-reply 4 (asserting that Petitioner's claim construction arguments "plainly exceed the proper scope of reply under Board rules").

Neither party asserts that "stackable add-on layer" has an accepted meaning in the art. *See Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004) (stating that, absent an accepted meaning in the art, "we construe a claim term only as broadly as provided for by the patent itself"). Thus, we must attempt to discern the meaning of this term from the claim language itself and from the remainder of the intrinsic record. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history."). Upon review of the parties' arguments and the intrinsic record, we agree with Petitioner that the '702 patent does not support a construction of "stackable add-on layer" that encompasses memory cells formed by sequential deposition on a substrate without being formed and then added to a separately formed substrate.

First, the plain language of the claim does not require merely a "layer" having a plurality of vertically oriented semiconductor memory cells, but rather "a stackable add-on layer" having a plurality of vertically oriented semiconductor memory cells; that plurality is bonded to the dielectric layer. Ex. 1001, 12:29–32. A construction that gives meaning to all words of the claim is preferred. *Merck & Co., Inc. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

The written description of the '702 patent summarizes the invention by stating that "a stackable add-on layer having a plurality of vertically oriented semiconductor memory cells" is formed separately from the substrate and then stacked on and bonded to the substrate. Ex. 1001, 1:47–50 ("Briefly, a plurality of vertically oriented semiconductor memory devices, or cells, may be ***added to a separately fabricated substrate*** that includes electrical devices and/or interconnect lines.") (emphasis added). The '702 patent discloses two ways of adding a memory cell layer. First, "[t]he plurality of vertically oriented semiconductor memory cells can be added to the separately fabricated substrate as a thin layer including several doped semiconductor regions which, subsequent to attachment, are etched to produce individual doped stack structures." *Id.* at code (57), 1:57–62. "Alternatively, the plurality of vertically oriented semiconductor memory cells may be completely fabricated prior to attachment" to the separately fabricated substrate. *Id.* at code (57), 1:67–2:3. In both of these methods, the memory cells are added as a layer to a separately fabricated substrate.

Generally supporting this understanding, the specification explains that a Silicon-on-Insulator ("SOI") layer refers to "a relatively thin, single

crystal portion of a semiconductor wafer that can be cleaved and bonded to another previously fabricated wafer, or similar type of substrate, such that a three dimensional stack is formed from the SOI layer and the previously fabricated wafer or similar type of substrate." Ex. 1001, 4:47–53. According to the '702 patent, "[i]n this context, the SOI layer may be thought of as an attachment layer, or stackable add-on structure which is suitable for bonding to a semiconductor substrate already containing devices and/or interconnections." *Id.* at 4:53–57. Consistent with the summary of the invention discussed above, this description in the '702 patent suggests that a "stackable add-on layer" is a layer that is formed separately from the semiconductor substrate and then bonded to the substrate that already contains devices and/or interconnections, i.e., a separately fabricated substrate. We further note that we are directed to no embodiment of the '702 patent wherein layers that are sequentially deposited on the substrate are identified as a "stackable add-on layer."

Based on the language of the claims and the disclosures found in the written description, we understand that a "stackable add-on layer" is a layer that is formed separately from the substrate and then bonded to the dielectric layer positioned above the substrate. We do not understand a "stackable add-on layer" to include memory cells that are formed by sequential deposition on or above a substrate without being added to a separately formed substrate.

As to the precise language of our construction, we agree with most of Petitioner's proposed modifications. We decline, however, to change "layer" to "structure," as proposed by Petitioner. The term "layer" is part of the term "stackable add-on layer," and removing it would therefore be

inappropriate. Petitioner does not generally disagree but wishes to make clear that a single "stackable add-on layer" could be comprised of several layers. Tr. 5:17–6:6. On that point, we agree that the term "a layer" could include one or more layers. *See ABS Global, Inc. v. Cytonome/St, LLC.*, 84 F.4th 1034, 1040 (Fed. Cir. 2023) (noting that in a "comprising claim" the use of "a" or "an" is generally construed to mean "one or more"); Ex. 1001, code (57) (explaining that the vertically oriented semiconductor memory cells may be attached as a thin layer containing "several doped semiconductor regions"); *see also id.* at 6:23–25 (stating the "transferred, unpatterned, SOI layer has only a vertically oriented stack of layers").

In view of the foregoing, we construe "stackable add-on layer" to mean "a layer formed separately from the substrate suitable to be bonded to the dielectric layer positioned above the substrate." Our construction also provides that a "stackable add-on layer" should not be read to include memory cells that are formed by sequential deposition on or above a substrate without being added to a separately formed substrate.

*D. Claims 13–15 over Lee*

Petitioner contends the subject matter of claims 13–15 would have been obvious over the disclosures of Lee. Pet. 46–59.

1. *Lee*

Lee is titled "Monolithic Three Dimensional Array of Charge Storage Devices Containing a Planarized Surface" and issued April 19, 2005. Ex. 1007, codes (45), (54).

Lee notes that the cost of memory and logic devices is decreased by increasing device density and that one method of increasing device density "is to arrange the devices in a monolithic three dimensional array of charge

storage devices comprising a plurality of device levels." Ex. 1007, 11:18–27. In this context, "monolithic" means that the layers of each level of the array are directly deposited on the layers of each underlying level of the array. *Id.* at 11:27–30. This is in contrast to two-dimensional arrays, which "may be formed separately and then packaged together to form a non-monolithic memory device." *Id.* at 11:30–32.

Figure 35 is reproduced below:

FIG. 35




Figure 35 is a schematic of a three-dimensional array of devices. Ex. 1007, 9:12–13. In the device of Figure 35, driver circuits 3103, such as sense amps and charge pumps, are disposed in monocrystalline substrate 3105, as CMOS or other transistors. *Id.* at 12:25–27. Interlayer insulating layer 3102 is then disposed on monocrystalline substrate 3105. *Id.* at 12:16–19. Charge storage logic or memory devices 3101 have a plurality of device levels 3104 that are preferably separated by interlayer insulating layers. *Id.* at 12:23–25.

Lee explains that "[t]he charge storage devices of the array may be any type of semiconductor devices which store charge, such as EPROMs or EEPROMs." Ex. 1007, 12:50–52. Such charge storage devices may be

formed in various configurations, "such as a pillar TFT EEPROM, a pillar diode with a charge storage region, a self aligned TFT EEPROM, a rail stack TFT EEPROM, and various other configurations." *Id.* at 12:52–57.

Figure 1A of Lee is reproduced below:




FIG. 1A

Figure 1A is an illustration of a pillar memory. Ex. 1007, 8:17–18. In Figure 1A, "[p]illar memory device 100 includes a first contact region 102 formed on a first input/output (I/O) 103 conductor formed on or above a plane (x-y) of a single crystal substate 101." *Id.* at 14:13–16. Semiconductor body 104 is formed directly on first contact region 102 and second contact region 106 is formed on body 104. *Id.* at 14:16–19. Second I/O region 116 is formed on second contact region 106. *Id.* at 14:19–20. Lee explains that first contact region 102, body 104, and second contact region 106 are each vertically aligned to form pillar 108. *Id.* at 14:20–23. "Adjacent to and in contact with body 104 is a charge storage medium 110," with control gate 112 formed adjacent to and in direct contact with charge storage medium 110. *Id.* at 14:23–26.

Lee explains that:

> The programmed and unprogrammed state of the pillar memory device is determined by whether or not charge is stored

> in charge storage medium 110. The charge stored in the charge storage medium adds or subtracts from the voltage applied to the control gate, thereby altering the voltage required to form a conducting channel in body 104 to enable a current (e.g., read current $I_R$) to flow between the first and second contact (source/drain) regions.

Ex. 1007, 14:32–39.

Figure 2 is reproduced below:




FIG. 2

Figure 2 is an illustration of a pillar memory. Ex. 1007, 8:27–28. In this embodiment, pillar 207 includes first source/drain contact region 202 comprising a heavily doped N+ silicon film that is formed on a first input/output 204 (e.g. bit line) that is formed on or above substrate 201. *Id.* at 15:16–22. Body 206 is composed of lightly doped P- type silicon film 206 that is formed on and in direct contact with N+ source/drain contact region 202. *Id.* at 15:22–25. Second drain region 208 is composed of a heavily doped N+ silicon film and is formed on and in direct contact with P- type silicon film 206. *Id.* at 15:25–30. "A second conductive input/output (e.g. word line/bit line) 210 is formed on the second N+

source/drain region 208." *Id.* at 15:30–31. Charge storage medium 211 comprises tunnel dielectric 212, floating gate 214, and control gate dielectric 216. *Id.* at 15:41–43. Control gate 218 is formed adjacent to, and in direct contact with, control gate dielectric 216. *Id.* at 15:50–52. "Control gate 218 is formed of a conductor such as but not limited to doped silicon or a metal such as tungsten." *Id.* at 15:52–54.

2. *Claim 13*

Petitioner contends that Lee discloses every limitation of independent claim 13. Pet. 46–54. With respect to the preamble and element 13[a], Petitioner contends Lee is directed to a semiconductor memory structure, Figure 35 of Lee depicts driver circuits 3103 formed in monocrystalline substrate 3105, and a dielectric layer (interlayer insulating layer 3102) is disposed on substrate 3105 and above the electrical devices. *Id.* at 46–47 (citing Ex. 1007, 1:25–26, 12:17–27, Fig. 35; Ex. 1002 ¶ 116).

With respect to element 13[b], Petitioner contends Figure 1A depicts TFTs and diodes arranged in a pillar configuration, i.e., vertically oriented with respect to the substrate, and Figure 35 shows an array of charge storage logic or memory devices 3101 with a "plurality of device levels 3104." Pet. 48–50 (citing Ex. 1007, 5:46–56, 12:17–27, Figs. 1A, 35). Petitioner asserts that, "[b]ecause Lee discloses 'a three dimensional nonvolatile memory array, comprising a plurality of vertically separated device levels,' in which 'each level comprise[es] an array of TFT EEPROMs,' the memory array is a stackable add-on layer having a plurality of vertically oriented semiconductor memory cells," *as apparently construed by Patent Owner*. *Id.* at 50 (citing Ex. 1007, 5:46–49, Ex. 1002 ¶ 118); *see id.* at 48 n.5 ("Lee

discloses the subject matter [of element 13[b]] of the ’702 Patent under the interpretation [Patent Owner] appears to adopt.”).

With respect to element 13[c], Petitioner contends that memory devices 3101 are formed above interlayer insulating layer 3102, and one of ordinary skill in the art would have understood that the memory array of Figure 35 is bonded to interlayer insulating layer 3102. Pet. 50–52 (citing Ex. 1007, 12:17–25; Ex. 1002 ¶ 119). As support for its argument that Lee discloses a stackable add-on layer bonded to an insulating layer, Petitioner points to Lee’s description of a monolithic array, Lee’s disclosures relating to Figure 35, and Lee’s disclosures relating to Figure 83A. *Id.* at 51–52 (citing Ex. 1007, 11:24–31, 55:32–36, Figs. 35, 83A).

With respect to element 13[d], Petitioner contends that Lee generally discloses that its array may contain EEPROMs (a form of nonvolatile memory) and that the memory device of Figure 1A is non-volatile and has at least one transistor. Pet. 53–54 (citing Ex. 1007, 14:10–23; Ex. 1002 ¶ 122).

As discussed above, we construe “stackable add-on layer” to not include memory cells that are formed by sequential deposition on or above a substrate without being added to a separately formed substrate. It is undisputed, and indeed it is Petitioner’s assertion, that Lee’s memory devices are formed by sequential deposition. *See* Pet. 52 (asserting that in Lee “the layers of the array are directly deposited on the layers of each underlying level, and the array is deposited on the interlayer insulating layer formed over a substrate”); *see also id.* at 70 (“Lee discloses forming vertical memory devices through layer-by-layer sequential deposition on the substrate . . . .”). Therefore, Petitioner does not show that Lee discloses every limitation of independent claim 13 under our claim construction.

Thus, Petitioner does not demonstrate by a preponderance of the evidence that claim 13 would have been obvious in view of Lee.

3. *Claims 14 and 15*

Claims 14 and 15 depend from claim 13. Ex. 1001, 12:35–42. Petitioner's arguments for these claims do not remedy the deficiencies noted above with respect to independent claim 13. Pet. 54–59. Accordingly, Petitioner does not demonstrate by a preponderance of the evidence that claims 14 and 15 would have been obvious in view of Lee alone.

*E. Claims 16 and 17 over Lee and Endoh*

Petitioner contends the subject matter of claims 16 and 17 would have been obvious over the combined disclosures of Lee and Endoh. Pet. 59–69. Petitioner's arguments with respect to these claims, however, do not remedy the deficiencies noted above with respect to Lee and its monolithic, sequentially deposited memory array. Accordingly, Petitioner does not demonstrate by a preponderance of the evidence that claims 16 and 17 would have been obvious over Lee and Endoh.

*F. Claim 13 over Watanabe*

Petitioner contends the subject matter of claim 13 would have been obvious over Watanabe. Pet. 13–26.

1. *Watanabe*

Watanabe is titled "Semiconductor Memory Device With a 3-Dimensional Structure," and issued February 25, 1992. Ex. 1005, codes (45), (54).

Watanabe explains that an object of its invention "is to provide a semiconductor memory device in which memory cells are arrayed three-

dimensionally, thereby providing a high integration density." Ex. 1005, 1:49–52. Figure 1 of Watanabe is reproduced below:




Figure 1 is a rough schematic illustration of a physical arrangement of a semiconductor memory device. Ex. 1005, 2:8–10. In Figure 1, the memory device is made up of two conductive planes 21 and 22 and four wires 23 to 26. *Id.* at 2:44–48. There are eight cross points where wires 23 to 26 pass through planar members 21 and 22. *Id.* at 2:48–51. Watanabe explains that "the conductive planar members 21 and 22 are used for inputting and outputting data (i.e., they serve as data planes), and wires 23 to 26 serve as word lines." *Id.* at 2:58–61. Watanabe further explains that the memory cell depicted in Figure 1 "is applicable to any type of memory device, i.e., a SRAM, a PROM, or a DRAM," but that the descriptions that follow in the patent are directed to a DRAM memory cell. *Id.* at 2:51–55.

Figure 2A is reproduced below:




F I G. 2A

Figure 2A is a sectional view of a part of the semiconductor memory device shown in Figure 1 "and shows details of the structure of the memory device," in this case, DRAM cell 50. Ex. 1005, 2:11–13, 2:62–63, Fig. 2A. In Figure 2A, conductive planar member 41 is in the form of an N+ type silicon layer and "serves as the source of the MOSFET." *Id.* at 2:66–3:2. P-type Si layer 42 is above planar member 41. *Id.* at 3:2. N+ type Si layer 45 is above layer 42, with a portion surrounding each associated wire 43, and is overlaid by thin insulating film 47. *Id.* at 3:6–9. Thick insulating film 48 fills the spaces between each portion of layer 45 and is overlaid with conductive layer 46. *Id.* at 3:9–12. Wire 43 is oriented orthogonally to planar member 41 and is separated from layers 41, 42, 45, and 46 by insulating film 44. *Id.* at 3:2–5. Watanabe explains that in this embodiment

"[a]t least two stack structures (two layers) each consisting of layers 41 to 46 are provided, which are insulated from each other by an insulating film 49, and through which the wires 43 pass." *Id.* at 3:12–15.

In operation, layer 41 serves as a data line for the input and output of data to and from the memory cell. Ex. 1005, 3:16–19. A potential is applied to layer 41 thereby placing wiring 43 in a high potential and inverting the conductivity of the portion of the p-type Si layer 42 that is in contact with the gate insulating film 44. *Id.* at 3:19–23. A charge is then transferred to the charge storage region 45 and stored in a capacitor located between region 45 and capacitor electrode 46. *Id.* at 3:23–27. "Then, if the potential of the wire 43 is decreased, the drain of the n+ Si layer 45 is electrically separated from the data plane 41." *Id.* at 3:27–30.

Watanabe explains that the semiconductor device of "the present invention may lower the resistance of the wires," because the data plane "is planar, not a thin line," making its resistance in the order of the "sheet resistance of the material used." Ex. 1005, 4:52–56. The word, or data, line is a thin line, but its length is at most 1 mm. *Id.* at 4:56–60.

Figure 7 is reproduced below:




Figure 7 "is a sectional view showing a[n] application of the present invention into an EPROM." Ex. 1005, 2:36–37. As shown in Figure 7, the disclosed EPROM includes control gate 106, floating gate 107, source 108, channel region 109, and drain region 110. *Id.* at 6:15–19.

Watanabe discloses two different methods of manufacturing its disclosed memory devices: a "laminating method" and a "stacking method." Ex. 1005, 5:1–7, 5:45–55. In the "laminating method," "a plurality of planar members are formed and are laminated, and holes are formed in the laminated planar members, through which the wiring passes." *Id.* at 5:1–7, Figs. 5A to 5E. In this method, a first planar member is completed in a sequence of process steps, and then a second planar member is formed over the first planar member in a sequence of process steps similar to that used to form the first planar member. *Id.* at 5:8–32. After "a desired number of planar members are first formed into a stack of planar members, . . . contact holes are formed and wires buried therein." *Id.* at 5:41–44.

In the "stacking method,"

> a first planar member is formed, and then wires are buried in the contact holes, respectively. A second planar member is formed, and the formed planar member is holed for contact hole, and wires are buried into the holes. The process is repeated by the number of times equal to a necessary number of planar members. Finally, the planar member[s] thus formed are stacked and wired.

Ex. 1005, 5:45–55, Figs. 6A–6D. Watanabe explains that the planar members are bonded together using a thermal process at 900 to 1000° C. *Id.* at 6:6–8. Thereafter, contact holes are formed and a second interconnection wire is buried to complete the semiconductor memory device. *Id.* at 6:8–11. According to Watanabe, "[i]n the stacking method, a number of process steps is increased, but a wiring accuracy is improved because the wiring is made [in] every planar member." *Id.* at 6:11–14.

2. *Claim 13*

Petitioner contends the subject matter of claim 13 would have been obvious in view of the disclosures of Watanabe. Pet. 13–26.

With respect to the preamble "[a] semiconductor memory structure, comprising," Petitioner contends Watanabe expressly states that its invention "relates to a semiconductor memory device." Pet. 14 (quoting Ex. 1005, 1:10–11).

With respect to element 13[a], Petitioner contends that in each of the "laminating" and "stacking" embodiments of Watanabe, the silicon substrate has "a peripheral circuit and transistors 71 and 72" that are formed in the upper surface thereof, as well as a dielectric layer 100 ("insulating film") formed over this Si substrate and above the electrical devices. Pet. 14–16 (citing Ex. 1005, 5:11–13, 5:58–61, Figs. 5A, 6A; Ex. 1002 ¶¶ 71–72).

With respect to element 13[b], Petitioner contends that planar members 21 and 22 in Watanabe's Figure 1 correspond to a "stackable add-on layer" and Figure 2A of Watanabe discloses the formation of semiconductor memory cells in which the transistors' source-channel-drain-elements (e.g., elements 41, 42, and 45) are arranged vertically. Pet. 16–21 (citing Ex. 1001, 1:65–2:2, 2:65–3:15, 4:7–9; Ex. 1002 ¶¶ 73–74; Ex. 1005, 5:1–6:14, Figs. 1, 2A, 5A–5E, 6A–6D).

Addressing elements 13[b] and 13[c], Petitioner contends that Watanabe's "stacking method" and "laminating method" teach or suggest a stackable add-on layer that is bonded to the dielectric layer under either Petitioner's ("stacking") or Patent Owner's ("laminating") constructions of "stackable add-on layer." Pet. 18–24 (citing Ex. 1005, 5:1–6:14, Figs. 5A–5E, 6A–6D; Ex. 1002 ¶¶ 76–82). In support of this argument, Petitioner walks through the various disclosed steps of forming the volatile DRAMs depicted in Figures 5A–E and 6A–D. *Id.*

Finally, with respect to element 13[d], Petitioner contends that the EPROM memory device of Figure 7 is a vertically-oriented, "nonvolatile memory" cell having at least one transistor. Pet. 25–26 (citing Ex. 1005, 6:15–19; Ex. 1002 ¶ 84; Ex. 1009, 25–26 ("One floating gate transistor suffices to build an EPROM memory cell.")).

Patent Owner contends the ground based on Watanabe alone fails because Petitioner fails to establish that Watanabe discloses the "non-volatile" requirement of element 13[d] (PO Resp. 56–59) and because Watanabe's stacking method is not enabled (*id.* at 62–63). As discussed below, we determine that Petitioner has not met its burden of proof to show

obviousness of claim 13 over Watanabe for each of these separate and independent reasons advanced by Patent Owner.

a. *"nonvolatile memory cells"*

Patent Owner contends the claims require that the "memory cells" be "nonvolatile memory cells," yet the majority of Petitioner's claim mapping for claim 13 is directed to the volatile DRAM memory depicted in Figures 1, 2A, 5, and 6. PO Resp. 56, 58–59. According to Patent Owner, Petitioner provides no explanation as to how the volatile and non-volatile embodiments of Watanabe identified in the Petition would have been combined, nor an explanation as to how the nonvolatile memory of Figure 7 would have been constructed using Watanabe's stacking method. *Id.* at 59 ("[Petitioner] provided no explanation of how it would be combined with the volatile embodiments, let alone with any reasonable expectation of success.").

Petitioner argues in reply that, although Figures 5 and 6 of Watanabe illustrate manufacturing methods for volatile DRAM, a person of ordinary skill in the art "would have understood that Watanabe's teachings regarding the manufacturing methods apply equally to any type of memory cell disclosed in the invention." Pet. Reply 23. According to Petitioner, it did not "combine Watanabe's DRAM and EPROM embodiments," but rather its citations to Figures 2A, 5, and 6 were merely to illustrate how Watanabe's "stacking" and "laminating" methods apply to the EPROM memory cell structure shown in Figure 7. *Id.* at 22–23. Petitioner contends, for example, that the contents of Figure 2A's cell 50 could be replaced with the nonvolatile memory cell shown in Figure 7 "because photolithography steps necessary to make an EPROM memory cell were well known and within the

skill of a [person of ordinary skill in the art].” *Id.* at 23–24 (citing Ex. 1041 ¶ 65).

Patent Owner responds that the Petition expressly relied upon Figures 1 and 2A of Watanabe for element 13[b] “and never argued that one of skill could replace the contents of Figure 2A’s cell.” Sur-reply 25 (citing Pet. 16–18; Pet. Reply 23). Patent Owner further contends that the argument that the contents of Figures 2A’s cell could be replaced by the EPROM of Figure 7 was not in the Petition and should not be considered now. *Id.* at 24–25.

We agree with Patent Owner that Petitioner has not met its burden of proof. Watanabe discloses both a laminating and stacking method and that its invention “is applicable to any type of memory device, i.e., a SRAM, a PROM, or a DRAM.” Ex. 1005, 2:51–53. The disclosures of Figures 1–6 expressly relied upon by Petitioner, however, are to the DRAM embodiment, which is a volatile type of memory, not nonvolatile, as recited in claim element 13[d]. *Id.* at 2:53–55 (“[H]owever, in the description to follow, the memory cell is depicted as incorporated in a DRAM.”). The Petition never identifies where Watanabe teaches or suggests elements 13[a]–[c] outside a DRAM embodiment, which lacks the nonvolatile memory cells of element 13[d]. Pet. 14–24. For example, the Petition does not show that Watanabe’s Figure 7 embodiment teaches or suggests elements 13[a]–[c]. *Id.*

Petitioner’s argument that the nonvolatile memory cell depicted in Figure 7 could be substituted in Watanabe Figure 2A is a new theory presented for the first time in reply. Pet. Reply 23–24. “It is of the utmost importance that petitioners in the IPR proceedings adhere to the requirement

that the initial petition identify 'with particularity' the 'evidence that supports the grounds for the challenge to each claim.'" *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3)). Any marked departure from the grounds identified with particularity in the petition would impose "unfair surprise" on the patent owner and, consequently, violate both the Administrative Procedure Act and the *inter partes* review statute. *Arthrex Inc. v. Smith & Nephew, Inc.*, 935 F.3d 1319, 1328 (Fed. Cir. 2019). Here, the Petition never asserted that the structure depicted in Figure 7 could be substituted into the structure depicted in Figure 2A, and considering that new argument now would impose an "unfair surprise" on Patent Owner. Pet. 25–26.

Moreover, even if Petitioner's new argument were considered, Petitioner fails to show that the combination of Figs. 2A and 7 satisfies claim elements 13[a]–[c]. For example, Petitioner never explains what the complete structure of Watanabe would be if the EPROM depicted in Figure 7 were inserted into the device depicted in Figure 2A. Pet. Reply 22–24. And, Petitioner fails to identify with particularity where every limitation of claim 13 is disclosed in Watanabe.

In view of the foregoing, Petitioner fails to identify where Watanabe teaches or suggests every limitation of independent claim 13. For this reason alone, Petitioner does not demonstrate by a preponderance of the evidence that claim 13 would have been obvious over Watanabe.

b. *Enablement of Watanabe's Stacking Method*

"To render a claim obvious, the prior art, taken as a whole, must enable a skilled artisan to make and use the claimed invention." *Raytheon Techs. Corp. v. Gen. Elec. Co.*, 993 F.3d 1374, 1380 (Fed. Cir. 2021). A

prior art reference, however, is presumed enabled, and the patentee has the burden to prove nonenablement. *Apple Inc. v. Corephotonics, Ltd.*, 861 F. App'x 443, 450 (Fed. Cir. 2021) (nonprecedential; *inter partes* review context); *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1354 (Fed. Cir. 2003). Moreover, "a prior art reference asserted under § 103 does not necessarily have to enable its own disclosure, i.e., be 'self-enabling,' to be relevant to the obviousness inquiry." *Raytheon*, 993 F.3d at 1380. For example, such a reference could provide the motivation to combine, and then be combined with a reference in which the limitation in question is enabled, or the reference could be used to supply the claim elements if it is enabled by another reference. *Id.* But "if an obviousness case is based on a non-self-enabled reference, and no other prior art reference or evidence would have enabled a skilled artisan to make the claimed invention, then the invention cannot be said to have been obvious." *Id.* at 1377.

1. The Parties' Arguments

Patent Owner contends that Watanabe's stacking method, relied upon by Petitioner to show elements 13[a]–[c], requires a thermal bonding process conducted at 900–1000° C. PO Resp. 62–63 (citing Ex. 1005, 6:6–8; Pet. 14–19, 21–23). Patent Owner further contends that Petitioner's expert, Dr. Lee, confirmed during his deposition that Watanabe's high-temperature bonding technique would exceed the thermal budget of the transistors embedded in the substrate, thereby damaging those transistors. *Id.* at 63 (citing Ex. 2028, 123:13–124:7). This problem is exacerbated, according to Patent Owner, because each layer in Watanabe is individually bonded and wired, and Watanabe "contemplate[s] bonding 100 layers, with 100 high-temperature bonding steps." PO Resp. 25; PO Sur-reply 14–15 (citing Ex.

1005, 4:35–38, 6:6–14; Ex. 2029 ¶¶ 75–76). Thus, Patent Owner contends Watanabe's stacking method is not enabled and "a skilled artisan would not have been motivated to use it for fear of over-baking the transistors." PO Resp. 56, 62–63 (citing Ex. 2027, 715; Ex. 2029 ¶¶ 70–77, 144–146); Sur-Reply 14–15.

Petitioner does not persuasively dispute that at the time Watanabe issued (1992) thermal bonding at 900–1000° C would damage or destroy transistors formed in the various layers of Watanabe's stackable device. *See* Pet. Reply 14, 25–26. Petitioner asserts, however, that in the relevant time period, i.e., as of the filing date of the '702 patent, one of ordinary skill in the art would have known how to apply "well-known solutions" to this problem. *Id.* at 14–15, 25–26; *Raytheon*, 993 F.3d at 1380 n.5 (explaining that a non-enabled patent may be used in conjunction with other, later-arising prior art that enables the disputed limitation).

First, Petitioner contends that it was understood in the art that the thermal budget is a measure of both temperature and time, and there existed in the art known methods of applying temperatures of 900–1000° C for short periods of time, such as electromagnetic induction heating (EMIH), that "do not exceed the thermal budget and avoid damage to the lower memory cells." Pet. Reply 14 (citing Ex. 1041 ¶¶ 35–44; Ex. 1048, 1:26–29, 1:40–43, 1:64–67; Ex. 1049; Ex. 1050, 515–516, 519; Ex. 1053, 15, 17–18, Table 1; Ex. 1059, 9–10).

Second, Petitioner contends that repeated heating to 900–1000° C for each successive layer of Watanabe could be avoided by bonding the various layers in a single step. Pet. Reply 15 (citing Ex. 1060, 285; Ex. 1059, 29). For example, Petitioner contends the art disclosed methods of

simultaneously bonding four pairs of stacked wafers using EMIH in 5 minutes. *Id.*

Patent Owner asserts in its Sur-reply that arguments about other heating methods, such as EMIH, are improper new arguments that should have been in the Petition, but nevertheless these arguments fail to establish that Watanabe is enabled. Sur-reply 11–12, 27. Patent Owner reasons that the EMIH references relied upon by Petitioner all originate from the work of "then-graduate student Keith Thompson: his patent, Ph.D. thesis, and an article," yet none of those references provide the solution Petitioner claims. *Id.* at 12 (citing Exs. 1048, 1059, 1060).

Patent Owner acknowledges that Thompson's silicon wafers were bonded using EMIH at 1000° C, with excellent bonds obtained in 5 minutes. Sur-reply 12 (citing Ex. 1059, 93–94). Patent Owner contends, however, that each wafer was still heated to 1000° C, a temperature that Dr. Lee testified could not be exceeded without detrimental effects. *Id.* at 13 (citing Ex. 2028, 123:13–124:7; Ex. 2029 ¶¶ 70–77). And, to the extent the layers of Watanabe could be heated to 900–1000° C for a certain period of time, Patent Owner contends that Petitioner and Dr. Lee never establish the amount of time Watanabe's layers could be safely exposed to high temperatures and not destroy the underlying electronic devices. *Id.* at 13–14, 27.

2. Analysis

Watanabe discloses bonding its stacked layers using a thermal process at 900–1000° C, and Petitioner expressly relies upon this bonding temperature in its arguments regarding Watanabe. Ex. 1005, 6:6–8; Pet. 22–23; Pet. Reply 25–26. Dr. Lee testified during his deposition, taken

in 2024, that any bonding at a temperature above 650° C would risk destroying the underlying electronic components in the substrate. Ex. 2028, 123:13–124:7 (Dr. Lee testifying that "[i]n other words, the processing of the upper layer transistors cannot go above 650 degrees C" due to the presence of the CMOS transistor in the substrate level). In support of this position, Dr. Lee referenced a publication by Batude,[5] which explains that when processing upper layer FETs, a low temperature (less than 650° C) "process is mandatory." Ex. 1034, 715; *see also* Ex. 1036 (errata sheet noting that the "Patude" reference discussed during Dr. Lee's deposition is actually "Batude"). This is strong evidence that Watanabe's high temperature bonding at 900–1000° C was not enabled.

We credit the testimony of Dr. Przybylski that one of ordinary skill in the art would have understood that Watanabe's stacked structure would be severely impacted if bonded at a temperature above 900° C, as disclosed in Watanabe. Ex. 2029 ¶¶ 76–77. Dr. Przybylski's opinion is supported by Dr. Lee's testimony (Ex. 2028, 123:13–124:7, 125:6–126:7), as well as Watanabe (Ex. 1005, 6:6–14) and Batude (Ex. 2027, 715). As further discussed below, we find that Petitioner has not rebutted Patent Owner's showing of nonenablement, and Patent Owner has carried its burden to demonstrate that Watanabe was not enabled for bonding temperatures of 900–1000° C, as of the 2004 filing date of the '702 patent.

---

[5] Perrine Batude, et al., *3-D Sequential Integration: A Key Enabling Technology for Heterogeneous Co-Integration of New Function with CMOS*, IEEE Journal on Emerging and Selected Topics in Circuits and Systems, Vol. 2, No. 4, December 2012 (Ex. 1034, "Batude").

Despite Dr. Lee's deposition testimony, Petitioner contends that, by the time the '702 patent was filed, one of ordinary skill in the art would have understood how to perform Watanabe's stacking method at 900° C or higher without exceeding the thermal budget of the underlying transistors. Pet. Reply 14–15, 25–26. In support of this position, Petitioner identifies various bonding disclosures, including the EMIH method of heating discussed above, that allow bonding to be completed over a much shorter time period than prior methods known in the art. *Id.* at 14–15 (citing Ex. 1048, 1:26–29, 1:40–43, 1:64–67; Ex. 1059, 9–10, 29; Ex. 1049; Ex. 1050, 515–516, 519; Ex. 1060, 285).

The EMIH methods relied upon by Petitioner appear to have been first developed by Keith J. Thompson, starting in 2001. *See* Ex. 1059 (Ph.D. dissertation of Keith Thompson: *Electromagnetic Fast-Firing for the Rapid Thermal Processing of Silicon*, 2003); Ex. 1048, code (60) (provisional filing date of June 8, 2001). In his dissertation, Dr. Thompson states that silicon-silicon and silicon-silicon dioxide bonding of wafers was achieved in 5 minutes at 1000° C using the disclosed EMIH heating methods. Ex. 1059, ii. On this record, however, Patent Owner persuasively demonstrates that Petitioner's EMIH evidence does not show that Watanabe's high-temperature bonding method could be used without exceeding the thermal budget of the underlying transistors in the substrate. Sur-Reply 10–15; *see id*. at 13 ("[Petitioner] and Dr. Lee have no answer for how, exactly, Thompson's microwaving at 1000° C would solve the thermal budget quandary.").

Dr. Lee was clear during his deposition—taken in 2024—that one of ordinary skill in the art would not have heated a substrate containing

transistors above 650° C. Ex. 2028, 123:13–21. Given Dr. Lee's 2024 testimony, we are persuaded that one of ordinary skill in the art as of the '702 patent's filing date (2004) would not have considered EMIH an acceptable method for heating Watanabe's stacked embodiment. Moreover, even if one of ordinary skill in the art would have considered EMIH's shortened heating time as a potential solution to the thermal budget problem in Watanabe, Patent Owner persuades us that no length of time has been identified in which Watanabe's stacked structures could be heated to 900–1000° C without irreparably damaging transistors 71 and 72 formed in Watanabe's silicon substrate. Sur-reply 13–14, 27; Ex. 1005, 5:58–60.

Petitioner and Dr. Lee point to various disclosures of successfully bonding silicon-silicon or silicon-silicon-oxide wafers at 1000° C and not exceeding the thermal budget of the wafers. Pet. Reply 14–15, 25–26; Ex. 1041 ¶ 44. But as Patent Owner persuasively argues and Petitioner does not dispute, it is unclear whether these wafers included any pre-formed transistors, much less multiple layers of metal wiring or doped stacked structures similar to those disclosed in Watanabe. Sur-reply 14; Tr. 39:25–40:2 (Petitioner's asserting that it is "unclear" whether the wafers of Thompson had transistors or memory devices).

Petitioner points to a publication by Regner[6] in which thermal budgets are discussed with respect to a substrate having CMOS devices formed therein. Pet. Reply 14 (citing Ex. 1053, 15, 17–18, Table 1); Ex. 1053,

[6] Jürgen Regner, *An Analytical Approach to Quantify the Thermal Budget in Consideration of Consecutive Thermal Process Steps*, 10th IEEE International Conference on Advanced Thermal Processing of Semiconductors (2002) (Ex. 1053, "Regner").

Abstract ("This paper presents an analytical approach to quantify the [Thermal Budget] of a given CMOS process flow . . . ."). This reference identifies multiple relevant variables, as well as complex and detailed equations for calculating the thermal budget for a CMOS process. Ex. 1053, 15–18. Petitioner and Dr. Lee do not address these equations or variables, much less use them to estimate the thermal budget for Watanabe's stacking method. Ex. 1041 ¶ 40. Rather, citing Regner, Dr. Lee testifies that bonding a structure at 900–1000° C could be achieved for a structure containing field-effect-transistors. *Id.* This conclusory testimony, unrelated to the specific structure identified in Watanabe, is not sufficient to refute Patent Owner's argument and evidence that Watanabe's stacking and bonding method at 900–1000° C—which is expressly disclosed in Watanabe and relied upon in the Petition (Ex. 1005, 6:6–8; Pet. 22)—could not be used without damaging the underlying electrical devices in the substrate.

Petitioner asserts that the '702 patent does not explain how to bond its stackable add-on layers and, therefore, that Patent Owner "demands more from the prior art than the teachings of its '702 Patent." Pet. Reply 16 (citing Ex. 1001). This argument is not persuasive. The Petition expressly relies upon a bonding temperature at or above 900° C, and Petitioner does not contend that one of ordinary skill in the art would have used a lower bonding temperature in Watanabe. Pet. 22–23; Pet. Reply 25–26. In contrast to Watanabe, the '702 patent expressly states that its processing temperature must not exceed 650° C. Ex. 1001, 7:15–29. As such, Patent Owner is not demanding more from the Petition than was disclosed in the '702 patent. Rather, Patent Owner persuades us that Watanabe and the other evidence cited by Petitioner do not disclose a viable method for bonding the

stacked structure of Watanabe at a temperature at or above 900° C, as asserted in the Petition, without damaging or destroying the underlying electric devices in the substrate. *See Raytheon*, 993 F.3d at 1382 (Petitioner "failed to provide an evidence-based case for how the turbofan engine claimed in the [challenged] patent having a particular power density is enabled by [prior art reference]'s disclosure. Thus, the Board's finding that [the reference] is 'enabling' is legal error.").

In view of the foregoing, we determine that Patent Owner has carried its burden to demonstrate that Watanabe was not enabled for bonding temperatures of 900–1000° C prior to the filing date of the '702 patent, and that Petitioner does not demonstrate by a preponderance of the evidence that claim 13 would have been obvious in view of Watanabe.

*G. Claims 14–17 over Watanabe and Endoh*

Petitioner contends the subject matter of claims 14–17 would have been obvious over the combined disclosures of Watanabe and Endoh. Pet. 26–46.

Claims 14–17 depend, directly or indirectly, from independent claim 13. Ex. 1001, 12:35–52. Petitioner's arguments regarding Watanabe and Endoh do not cure the deficiencies noted above with respect to Watanabe. Accordingly, Petitioner does not demonstrate by a preponderance of the evidence that claims 14–17 would have been obvious over the combined disclosures of Watanabe and Endoh.

*H. Claims 13–15 over Lee and Watanabe*

Petitioner contends the subject matter of claims 13–15 would have been obvious in the view of the combined disclosures of Lee and Watanabe. Pet. 69–73.

1. *Analysis – Claim 13*

a. *Arguments in the Petition*

Petitioner asserts that, "[t]o the extent Claim 13 is construed to exclude forming a 'stackable add-on layer' through sequential deposition directly on a substrate," the subject matter of claim 13 is disclosed by Lee in view of Watanabe. Pet. 69.

Petitioner contends that Lee discloses the subject matter of the preamble and elements 13[a] and 13[d]. Pet. 71 (relying on same contentions as presented for Lee alone). With respect to claims 13[b] and 13[c], Petitioner contends that Lee and Watanabe both disclose vertically oriented, non-volatile memory cells that are bonded to a dielectric layer that is deposited over the substrate. *Id.* at 71–72. Petitioner further contends that Watanabe and Lee both disclose forming memory devices through layer-by-layer sequential deposition but that Watanabe also discloses an alternative "stacking method" in which stackable memory layers are formed individually and then bonded to a separately-fabricated substrate. *Id.* at 70, 72.

Petitioner contends one of ordinary skill in the art would have combined Watanabe and Lee because both references "provide complementary solutions for arranging memory cells three-dimensionally to provide a high integration density." Pet. 69 (citing Ex. 1007, 11:18–32; Ex. 1005, 1:49–2:5). According to Petitioner, one of ordinary skill in the art "seeking to increase the integration density of semiconductor memory devices, and specifically nonvolatile memory devices, would have known of and consulted these proposed solutions." *Id.* at 69–70 (citing Ex. 1002 ¶ 144). Although Lee discloses forming its memory cells through layer-by-

layer sequential deposition on the substrate, Petitioner contends that Watanabe discloses an "alternative method" of construction, and one of ordinary skill in the art would have sought to "obtain the benefits associated with that method." *Id.* at 70 (citing Ex. 1002 ¶ 145). Petitioner further notes that Watanabe "discloses a benefit of using its 'bonding method'—it 'improves the accuracy of the wiring.'" *Id.* at 71 (quoting Ex. 1005, 5:64–6:3).

b. *Arguments in Patent Owner's Response*

Patent Owner contends that the Petition does not establish a motivation to combine Watanabe and Lee, asserting only that Watanabe offers "an alternative method" that would provide unspecified "benefits associated with that method." PO Resp. 32 (quoting Pet. 70). Patent Owner further contends that, because no advantages to the combination have been identified, Petitioner's simple offering of two "alternative method[s]" falls short of establishing a motivation to combine them. *Id.* at 33 ("[I]f it ain't broke, don't fix it.").

In addition, Patent Owner contends use of Watanabe's stacking method, with its bonding step at 900–1000° C, would risk destroying the transistors of Lee that are located in Lee's substrate. PO Resp. 25–26. Patent Owner contends Dr. Lee confirmed this risk when he testified that upper layer transistors cannot be subject to processing temperatures above 650° C without damaging the transistors in the substrate. *Id.* at 26 (citing Ex. 2028, 123:13–124:7).

Patent Owner further contends that Lee actually expresses a preference for "monolithic" structures and contrasts such a method from packaging together two-dimensional arrays. PO Resp. 33–34 (citing

Ex. 1007, 11:25–32). Patent Owner also asserts that Lee and Watanabe use "incompatible data flows" that "were not readily combinable." *Id.* at 28, 34–35.

c. *Petitioner's Reply Arguments*

Petitioner argues in reply that Watanabe discloses both stacking and sequential deposition methods and both approaches may be used to arrange memory cells "three-dimensionally, thereby providing a high integration density." Pet. Reply 13 (quoting Ex. 1005, 1:49–52). Petitioner further argues that whether you use a stacking method or sequential deposition, either "would improve the device density" because "Lee's benefits derived from 3-D integration would be obtained if Lee's memory structures are formed using Watanabe's alternative stacking method." *Id.* at 13–14 (quoting Ex. 2028, 62:20–63:4).

With respect to bonding temperature, Petitioner contends that one of ordinary skill in the art would have understood how to bond Lee's memory layers using Watanabe's 900–1000° C bonding temperature in a way that does not exceed the thermal budget of the device or damage the lower memory cells. Pet. Reply 14 (citing Ex. 1041 ¶¶ 35–44; Ex. 1053, 15, 17–18, Table 1). For example, Petitioner identifies the EMIH method of bonding a stack of silicon wafers that it contends would not exceed the thermal budget of Lee's device layers or transistors. *Id.* (citing Ex. 1048, 1:26–29, 1:40–43, 1:64–67; Ex. 1059, 9–10; Ex. 1049).

d. *Patent Owner's Sur-reply Arguments*

Patent Owner contends that Petitioner's argument that one of ordinary skill in the art would have combined Lee and Watanabe because Lee's memory structure *could* be formed using Watanabe's alternative stacking

method is not persuasive. Sur-reply 8–9. According to Patent Owner, "[s]imply disclosing 'two alternative arrangements . . . does not provide a reason that a skilled artisan would have substituted' one for the other." *Id.* at 9 (quoting *Virtek Vision Int'l ULC v. Assembly Guidance Systems, Inc.*, 97 F.4th 882, 886–87 (Fed. Cir. 2024)).

Patent Owner also contends that Petitioner "never grapples with how, exactly, Lee's memory cells could be implemented by stacking." Sur-reply 9. Patent Owner reasons that Lee's interleaved levels have memory cells that share control gates and use higher levels to pattern the lower ones, and Petitioner "points to no clear partition point in Lee's array where the memory cells could be separately fabricated on different layers, let alone properly aligned." *Id.*

Patent Owner also contends that a "glaring problem" with combining Lee and Watanabe is that Watanabe's 900–1000° C bonding temperature would exceed the thermal budget of the device and destroy Lee's memory. Sur-reply 10, 12–13. Patent Owner further contends that Petitioner does not adequately explain how the stacked layers of Lee and Watanabe could be successfully aligned, absent using the disclosures of the '702 patent as a roadmap. *Id.* at 15–16 ("[Petitioner] using the challenged patent itself to find missing solutions is the epitome of impermissible hindsight.").

e. *Analysis—Motivation to Combine*

Petitioner contends that one of ordinary skill in the art would have combined Lee and Watanabe to achieve improved integration density. Pet. 71. Petitioner concedes, however, that the benefits of Lee's design related to 3-D integration and improved integration density would be obtained if Lee's memory structures are formed using either Lee's

monolithic construction method or Watanabe's alternative stacking method. Pet. Reply 13–14 (citing Ex. 1041 ¶ 34). Thus, we are not persuaded that improved integration density provides a sufficient rationale for Petitioner's combination of Lee's memory device and Watanabe's stacking method.

Petitioner argues that Watanabe's stacking method "improves the accuracy of the wiring" because the wiring is made "for each planar member." Pet. 72 (citing Ex. 1005, 6:1–3). Watanabe also states that its disclosed methods provide "a low interconnection wire resistance." Ex. 1005, 6:20–23. Petitioner does not, however, explain sufficiently how Watanabe's stacking method would improve Lee's device. For example, Petitioner does not address whether the alleged wiring benefit already existed in Lee's monolithic array or explain how this benefit would also apply to Lee's particular memory array, which differs in construction and elements from Watanabe's device. This diminishes Petitioner's benefits-based motivation to combine arguments.

In general, a petitioner need not demonstrate that a particular alternate method would *improve* a prior art device in order to show a motivation to combine. *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1380–81 (Fed. Cir. 2023); *see* Pet. Reply 20 (citing *Intel*). But here, Petitioner affirmatively invokes improvement of Lee's device as a reason for the combination, and we must evaluate Petitioner's contention. Moreover, any relative lack of improvement or benefits must be weighed against any problems the alternative method would introduce. *See Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 795–96 (Fed. Cir. 2021) (noting that simultaneous advantages and disadvantages to a proposed combination must be analyzed to determine whether the disadvantages "outweighed any reason

to combine"). Here, as discussed above in more detail with respect to the ground based on Watanabe, the evidence shows that one of ordinary skill in the art would have expected Watanabe's bonding temperature of 900–1000° C to damage the electronic devices in an underlying substrate. Ex. 2029 ¶¶ 75–76; Ex. 2028, 123:13–124:7; Ex. 2027, 715. The expected damage to Lee's device, when balanced against the limited evidence of a benefit to the combination,[7] outweighs the reason to combine Lee and Watanabe set forth in the Petition. Accordingly, Petitioner does not demonstrate by a preponderance of the evidence that claim 13 would have been obvious over Lee and Watanabe.

2. *Analysis – Claims 14 and 15*

Claims 14 and 15 both depend directly from independent claim 13. Ex. 1001, 12:35–42. Petitioner's arguments with respect to claims 14 and 15 do not remedy the deficiencies noted above with respect to independent claim 13. Pet. 73. Accordingly, Petitioner does not demonstrate by a preponderance of the evidence that these claims would have been obvious over Lee and Watanabe.

*I. Claims 16 and 17 over Lee, Watanabe, and Endoh*

Claim 16 depends directly from claim 13, and claim 17 depends indirectly from claim 13. Ex. 1001, 12:44–52. Petitioner contends the subject matter of claims 16 and 17 would have been obvious over the combined disclosures of Lee, Watanabe, and Endoh. Pet. 73–74.

[7] For example, it is unclear how improved wiring between the memory cells and the devices in the substrate, or lower wiring resistance, would be beneficial if the devices in the substrate are destroyed or damaged by the proposed bonding method.

Petitioner's arguments in this ground, however, do not remedy the deficiencies noted above with respect to the combination of Lee and Watanabe. *Id.* Accordingly, Petitioner does not demonstrate by a preponderance of the evidence that challenged claims 16 and 17 would have been obvious over Lee, Watanabe, and Endoh.

## IV. PATENT OWNER'S MOTION TO STRIKE

Patent Owner moves to strike Exhibits 1033, 1035, 1041 (¶¶ 12–70), 1047–1050, 1052–1055, and portions of Petitioner's Reply. Mot. 1–10. Petitioner opposes. Opp. 1–10.

Patent Owner contends Petitioner presents new arguments and evidence related to Watanabe and Endoh in its Reply that should have been in the Petition. Mot. 3–8. Patent Owner also contends that Petitioner raises new claim construction arguments, along with new exhibits and expert testimony regarding claim construction, that should have been in the Petition, and not presented for the first time in the Reply. *Id.* at 8–10. We address these arguments below.

### *A. New Theories*

Patent Owner contends that Petitioner presents new theories and supporting evidence for the first time on reply relating to EMIH heating, mechanical alignment, and DRAM embodiments in Watanabe. Mot. 3–7. Patent Owner further contends that Petitioner's Reply relies on a new unpatentability theory regarding Endoh and improperly seeks to recant Dr. Lee's testimony regarding Lee's disclosures. *Id.* at 6–8.

Having considered this evidence and arguments, we found in favor of Patent Owner.[8] Thus, Patent Owner's motion to strike allegedly new arguments and evidence related to Watanabe, Endoh, and Lee is dismissed as moot.

*B. Claim Construction Arguments*

Patent Owner contends Petitioner in its Reply improperly provides claim constructions related to "stackable add-on layer" and "SOI pillar," as well as three new exhibits (Exs. 1033, 1035, 1060) and twelve paragraphs of new declaration testimony (Ex. 1041 ¶¶ 12–33), that should have been provided in the Petition. Mot. 8–9. Patent Owner also contends that Petitioner relied upon new testimony from Dr. Lee regarding the application of its new claim construction arguments to its unpatentability theories relating to Endoh. *Id.* at 9 (citing Ex. 1041 ¶¶ 60–63, 67–69).

With respect to "stackable add-on layer," Patent Owner contends that Petitioner and Dr. Lee understood that this term would be determinative for some grounds but waited until the Reply to provide an express construction. Mot. 8. And, because the claim construction arguments were not raised in the Petition, Patent Owner contends Petitioner's new constructions provided for the first time in reply should be stricken. *Id.* at 8–9; Sur-reply 4

---

[8] We agree that Petitioner's reply arguments with respect to implementing the structure depicted in Figure 7 of Watanabe in Figure 2A is a new theory. The more appropriate course, however, is for us to not consider this new theory, as opposed to striking it from the record. Patent Trial and Appeal Board Consolidated Trial Practice Guide November 19, at 80 (explaining that the Board is capable of identifying and disregarding "any new issues or belatedly presented evidence that exceeds the proper scope of reply or sur-reply"). In any event, for the reasons discussed above, even if we considered this argument, Patent Owner would still prevail.

("[Petitioner's] arguments plainly exceed the proper scope of reply under Board rules."). According to Patent Owner, Petitioner's new claim construction theories prejudice Patent Owner because Patent Owner's only vehicle to respond is an abbreviated sur-reply with no opportunity to present new evidence. Mot. 9–10. We are not persuaded by Patent Owner's arguments.

First, the Petition in fact recognized that the proper construction of "stackable add-on layer" could be in dispute and provided Petitioner's general understanding as to the scope of the claim term. Pet. 6 n.2. The Petition also recognized that the term "stackable add-on layer" might be construed to permit direct deposition of each layer of memory on the substrate or insulating layer, and asserted that the challenged claims were unpatentable under either Petitioner's or Patent Owner's construction of the term. *Id.* at 12, 13 n.3, 16–21, 48 n.5. Thus, both the Board and Patent Owner were on notice as to how Petitioner was interpreting the term "stackable add-on layer" and how Petitioner was applying this construction to the prior art challenges.

The Institution Decision generally adopted Petitioner's understanding of the term "stackable add-on layer" and identified intrinsic evidence supporting this construction. Inst. Dec. 7–9. The Institution Decision also encouraged the parties to expressly construe the term with citation to intrinsic evidence. *Id.* at 9 n.5. Petitioner provided a construction of "stackable add-on layer" at its next available opportunity, supporting its construction with citations to intrinsic evidence. Pet. Reply 4–9; Opp. 3–4. Contrary to Patent Owner's arguments, there is nothing improper with Petitioner providing a requested claim construction in its Reply, or in relying

on new evidence to support that construction, so long as Patent Owner has an adequate opportunity to respond.

For example, in *Hamilton Beach Brands, Inc. v. F'real Foods, LLC*, 908 F.3d 1328, 1338–1339 (Fed. Cir. 2018), the court noted that it was acceptable for the Board to address a claim construction not raised in the Petition, so long as both parties had notice of the contested claim construction issues and an opportunity to respond. And in *Rembrandt Diagnostics, LP v. Alere, Inc.* 76 F.4th 1376, 1383–84 (Fed. Cir. 2023), the court noted that a petitioner is entitled to respond to arguments raised in a "decision on institution" and that the introduction of new evidence during the course of the trial is both to be expected and permissible, "as long as the opposing party is given notice of the evidence and an opportunity to respond." *Id.* (quoting *Genzyme Therapeutic Prods. Ltd. P'ship v. Biomarin Pharm. Inc.*, 825 F.3d 1360, 1366 (Fed. Cir. 2016)).

Patent Owner had multiple opportunities to provide a construction of the term "stackable add-on layer," and at least one opportunity to address Petitioner's reply evidence, but chose not to. Paper 6, 13 (Preliminary Response); PO Resp. 12–13 (asserting that Patent Owner disagrees with the Board's construction, but electing not to provide its own construction of "stackable add-on layer"); PO Sur-reply 4. Moreover, to the extent Patent Owner felt it required the opportunity to rely on additional evidence in its Sur-reply, it could have requested the Board provide such an opportunity. *See ZyXel Commc'ns Corp. v. UNM Rainforest Innovations*, 107 F.4th 1368, 1382–83 (Fed. Cir. 2024) (noting that a patent owner may request that the Board waive its rule against submitting new evidence with a sur-reply). Instead, Patent Owner chose to avoid engaging in the construction of

"stackable add-on layer" altogether. *See id.* (noting that the patent owner did not identify any evidence it would have provided in the sur-reply had it been given a chance).

In view of the foregoing, we determine that Patent Owner had an adequate opportunity to address the proper construction of "stackable add-on layer" and to address Petitioner's construction of this term, but simply chose not to. Accordingly, Patent Owner's request to strike Petitioner's construction of "stackable add-on layer," Petitioner's "unpatentability theories based on them," and Exhibits 1033, 1035, 1060, and 1047 ¶¶ 12–23, is denied.[9]

With respect to "SOI pillar," Patent Owner contends Dr. Lee testified under cross-examination that he did not know the "plain and ordinary meaning" of "pillar," but provided a new construction of this term on reply, along with ten paragraphs of new testimony and four new exhibits. Mot. 8–9. For the reasons set forth above, for purposes of resolving the controversy, we need not address the proper construction of "SOI pillar" or rely on any of Petitioner's arguments with respect to this term. Accordingly, Patent Owner's request to strike Petitioner's construction of "SOI pillar" and the identified documents is dismissed as moot.

[9] We note that Petitioner's arguments with respect to the "stackable add-on layer" remained the same throughout this proceeding, i.e., that Watanabe discloses this limitation under either parties' potential construction and Lee discloses the limitation under Patent Owner's apparent construction of the term (permitting direct deposition).

## V. CONCLUSION

For the foregoing reasons, we determine that Petitioner fails to demonstrate by a preponderance of the evidence that claims 13–17 are unpatentable. Our conclusions are summarized in the following table.

| **Claim(s)** | **35 U.S.C. §** | **Reference(s)/Basis** | **Claim(s) Shown Unpatentable** | **Claim(s) Not Shown Unpatentable** |
|---|---|---|---|---|
| 13 | 103(a) | Watanabe | | 13 |
| 14–17 | 103(a) | Watanabe, Endoh | | 14–17 |
| 13–15 | 103(a) | Lee | | 13–15 |
| 16, 17 | 103(a) | Lee, Endoh | | 16, 17 |
| 13–15 | 103(a) | Lee, Watanabe | | 13–15 |
| 16, 17 | 103(a) | Lee, Watanabe, Endoh | | 16, 17 |
| **Overall Outcome** | | | | 13–17 |

## ORDER

For the foregoing reasons, it is:

ORDERED that Petitioner does not demonstrate that any challenged claim of the ’702 patent is unpatentable;

FURTHER ORDERED that Patent Owner’s Motion to Strike is denied with respect to the proper construction of “stackable add-on layer” and Exhibits 1033, 1035, 1060, and 1047 ¶¶ 12–23, and dismissed as moot with respect to all other issues; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

PETITIONER:

John Kappos
Xin-Yi ZHOU
Ben Haber
William Fink
Patric Reinbold
O'MELVENY & MYERS LLP
jkappos@omm.com
vzhou@omm.com
bhaber@omm.com
tfink@omm.com
preinbold@omm.com

PATENT OWNER:

Michelle Armond
Douglas Wilson
Josepher Li
Yue Han
ARMOND WILSON LLP
michelle.armond@armondwilson.com
doug.wilson@armondwilson.com
josepher.li@armondwilson.com
amy.han@armondwilson.com

US007378702B2

(12) **United States Patent**
**Lee**

(10) **Patent No.: US 7,378,702 B2**
(45) **Date of Patent: *May 27, 2008**

(54) **VERTICAL MEMORY DEVICE STRUCTURES**


(76) Inventor: **Sang-Yun Lee**, 17082 NW. Elk Run Dr., Beaverton, OR (US) 97006


(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.


(21) Appl. No.: **10/934,270**

(22) Filed: **Sep. 3, 2004**

(65) **Prior Publication Data**

US 2005/0280061 A1 Dec. 22, 2005

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 10/873,969, filed on Jun. 21, 2004, now Pat. No. 7,052,941.

(51) **Int. Cl.**
*H01L 27/108* (2006.01)

(52) **U.S. Cl.** ........................ **257/296**; 257/295; 257/315

(58) **Field of Classification Search** ................ 438/152, 438/153; 257/118, 199, 314, 315, 296, 295
See application file for complete search history.


(56) **References Cited**

U.S. PATENT DOCUMENTS


6,943,067 B2 * 9/2005 Greenlaw .................. 438/152


* cited by examiner

*Primary Examiner*—Andy Huynh
*Assistant Examiner*—Thinh T Nguyen
(74) *Attorney, Agent, or Firm*—Schmeiser, Olsen & Watts LLP

(57) **ABSTRACT**


Vertically oriented semiconductor memory cells are added to a separately fabricated substrate that includes electrical devices and/or interconnect. The plurality of vertically oriented semiconductor memory cells are physically separated from each other, and are not disposed within the same semiconductor body. The plurality of vertically oriented semiconductor memory cells can be added to the separately fabricated substrate as a thin layer including several doped semiconductor regions which, subsequent to attachment, are etched to produce individual doped stack structures, which are then supplied with various dielectric coatings, gate electrodes, and contacts by means of further processing operations. Alternatively, the plurality of vertically oriented semiconductor memory cells may be completely fabricated prior to attachment. DRAMs, SRAMs, non-volatile memories, and combinations of memory types can be provided.


**17 Claims, 34 Drawing Sheets**



Fig. 1


122
124
121
132
142
134
133
133a
123
131
114
135
143
656
n+
p
p+
152
101
151
103




Fig. 2

Fig. 3



Fig. 4


121 (Vbias)
134
131
CAP2
124
WL1
183
CAP1
n
p
n+
p
n
p+
122
(Vbias)
123
(WL2)
BL
133a
133

Fig. 5



Fig. 6



Fig. 7



Fig. 8



Fig. 9


122
111
121
Capacitor
124
124
124
124
124
123
131
132
114
131
p+
p+
p+
n+
n+
142
n-well
p-sub
143
101
151
103

Fig. 10


Capacitor
122
111
121
124
142
p+
n-well
114
p+
p-sub
n+
143
n+
131
131
101a
101
151
103

Fig. 11


Capacitor
122
111
121
Capacitor
124
123
131
132
114
142
n-well
p+
n+
p-sub
143
101
151
103

Fig. 12


Vbias
Capacitor
122
WL1
183
121
134
131
Capacitor
Vbias
n+
p
n+
p
n+
123 (WL2)
BL
124
133a
133

Fig. 13



Fig. 14



Fig. 15



Fig. 16



Fig. 17



Fig. 18






Fig. 19

Fig. 20


WL2
123 (WL1)
BL
WL1'
WL2'
121 (Vbias)
134
131
122 (Vbias)
183
124
133a
133
p+
n
p
n+
p
n+
p
n+
p
n
p+

Fig. 21



Fig. 22


121 (Vbias)
134
131
WL2
123 (WL1)
WL1'
WL2'
p+
n
p
n+
p
n+
121' (BL)
n+
p
n+
p
n
p+
122 (Vbias)
183
124
133a
133
102
101

Fig. 23



Fig. 24



Fig. 25



Fig. 26



Fig. 27


121 (Vbias)
134
131
122 (Vbias)
183b
123k
183c (WL1)
n+
p
n
p
n+
123 (WL2)
BL
124
133a
133

Fig. 28



Fig. 29


SG2
123c (WL2)
WL1
SG1
121 (BL)
134
131
133
133a
183c
183b
124
122 (Vbias)
n+
p
n+
p
n+
p
n+
p
n+

Fig. 30



Fig. 31


121 (BL)
134
131
WL4
123c (WL3)
WL2
WL1
n+
p
n+
p
n+
p
n+
p
n+
122 (Vbias)
124
183
133a
133

Fig. 32



Fig. 33


132
122
124
183b
121
SG
Source
Vbias
133
132
133a
131
SG
Drain
BL
183c
123
123k
n+
p

Fig. 34


WL16
WL15
WL14
WL13
SG
Source
131
Vbias
132
WL12
WL11
WL10
WL9
122
WL8
WL7
WL6
WL5
132
132
WL4
WL3
WL2
WL1
SG
Drain
BL
131

# VERTICAL MEMORY DEVICE STRUCTURES

## CROSS REFERENCE TO RELATED APPLICATIONS

This is a continuation-in-part of application Ser. No. 10/873,969, entitled "Three-Dimensional Integrated Circuit Structure and Method of Making Same", filed 21 Jun. 2004; and which is incorporated in its entirety herein by reference.

## FIELD OF THE INVENTION

The present invention relates generally to semiconductor structures and manufacturing methods for memory devices and circuits. More particularly, the present invention relates to a semiconductor substrate combined with a relatively thin add-on semiconductor layer in which various vertically oriented memory elements are fabricated.

## BACKGROUND OF THE INVENTION

Advances in semiconductor manufacturing and digital systems architecture have provided the means to produce chips, or integrated circuits, with many millions of active and passive circuit elements along with the interconnects needed to create the desired circuit networks. As is well-known, integrated circuits contain transistors that are primarily implemented on a single major surface of a substrate, such as a semiconductor wafer. These laterally oriented devices consume significant amounts of chip area. Over a number of years, manufacturing advances related to transistors and interconnects have primarily been directed to reducing the lateral dimensions thereof, so that more circuitry per unit area could be placed on a chip. However, the manufacturing equipment and technologies required to support the manufacture of such highly integrated chips becomes increasingly expensive with each new generation of smaller devices.

What is needed are structures and methods that are suitable for providing increased circuit density in integrated circuits without necessarily requiring devices to be made smaller.

## SUMMARY OF THE INVENTION

Briefly, a plurality of vertically oriented semiconductor memory devices, or cells, may be added to a separately fabricated substrate that includes electrical devices and/or interconnect lines. The plurality of vertically oriented semiconductor memory devices, or cells, are physically separated from each other, and therefore are not disposed within a common semiconductor body, or semiconductor substrate. The regions around and between the vertically oriented memory devices, or cells may have dielectric material disposed therein.

In one aspect of the present invention, the plurality of vertically oriented semiconductor memory devices, or cells, are added to the separately fabricated substrate as a thin layer including several doped semiconductor regions which, subsequent to attachment to the substrate, are etched to produce individual doped stack structures. These individual, vertically oriented, doped stack structures are, in various embodiments, fitted out with a variety of structures, such as but not limited to gate dielectric films, gate electrodes, capacitor terminals, contacts, charge trapping multi-layer films, and floating gates. In other embodiments of the present invention, the plurality of vertically oriented semiconductor memory cells may be fabricated prior to attachment to the separately fabricated substrate.



In another aspect of the present invention, Dynamic Random Access Memory (DRAM) cells, Static Random Access Memory (SRAM) cells, non-volatile memory cells, and similar structures may be formed in a stackable add-on layer for use in conjunction with the separately fabricated substrate.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a cross-sectional view of an embodiment the present invention that includes a base semiconductor substrate and add-on vertical memory devices.

FIG. **2** is a cross-sectional view of an embodiment of the present invention having a vertical DRAM cell with vertical connection of a capacitor and a MOSFET in the SOI layer.

FIG. **3** is a schematic diagram of an equivalent circuit for the structure shown in FIG. **2**.

FIG. **4** is a cross-sectional view of an embodiment of the present invention having two vertical DRAM cells with vertical connection of a capacitor and a MOSFET, respectively in the SOI layer.

FIG. **5** is a schematic diagram of an equivalent circuit for the structure shown in FIG. **4**.

FIG. **6** is a cross-sectional view of an embodiment of the present invention having two vertical DRAM cells with vertical connection of a capacitor and two MOSFETs in the SOI layer.

FIG. **7** is a schematic diagram of an equivalent circuit for the structure shown in FIG. **6**.

FIG. **8** is a cross-sectional view of an embodiment of the present invention having a vertical DRAM cell with vertical connection of a MOSFET in the SOI layer and an external capacitor.

FIG. **9** illustrates an exemplary DRAM structure formed with devices illustrated in FIG. **8**.

FIG. **10** illustrates an exemplary DRAM structure formed with devices illustrated in FIG. **8**.

FIG. **11** illustrates another exemplary DRAM structure formed with devices illustrated in FIG. **8**.

FIG. **12** is a cross-sectional view of an embodiment of the present invention having two vertical DRAM cells with vertical connection of two MOSFETs in the SOI layer and two external capacitors.

FIG. **13** is a schematic diagram of an equivalent circuit for the structure shown in FIG. **12**.

FIG. **14** is a cross-sectional view of an embodiment of the present invention having a Negative Differential Resistance (NDR) based vertical SRAM cell with vertical connection of two MOSFETs in the SOI layer.

FIG. **15** is a schematic diagram of an equivalent circuit for the structure shown in FIG. **14**.

FIG. **16** is a cross-sectional view of an embodiment of the present invention having a Negative Differential Resistance based vertical SRAM cell with vertical connection of a Thyristor and a MOSFET in the SOI layer.

FIG. **17** is a schematic diagram of an equivalent circuit for the structure shown in FIG. **16**.

FIG. **18** is a cross-sectional view of an embodiment of the present invention having a Negative Differential Resistance based vertical SRAM cell with vertical connection of a bi-stable diode and a MOSFET in the SOI layer.

FIG. **19** is a schematic diagram of an equivalent circuit for the structure shown in FIG. **18**.

FIG. **20** is a cross-sectional view of an embodiment of the present invention having two Negative Differential Resistance based vertical SRAM cells with vertical connection of a Thyristor and a MOSFET, respectively in an SOI layer.

FIG. **21** is a schematic diagram of an equivalent circuit for the structure shown in FIG. **20**.

FIG. **22** is a cross-sectional view of an embodiment of the present invention having two Negative Differential Resistance based vertical SRAM cells with vertical connection of a Thyristor and a MOSFET, respectively in two SOI layers.

FIG. **23** is a cross-sectional view of an embodiment of the present invention having a vertical memory cell with a vertical MOSFET in the SOI layer, where the vertical memory has a floating gate and a control gate, and could work as a DRAM and a nonvolatile memory device.

FIG. **24** is a schematic diagram of an equivalent circuit for the structure shown in FIG. **23**.

FIG. **25** is a cross-sectional view of an embodiment of the present invention having a vertical memory cell with a vertical MOSFET in the SOI layer, where the vertical memory has a charge-trapping gate insulating layer, and could work as a DRAM and a nonvolatile memory devices.

FIG. **26** is a schematic diagram of an equivalent circuit for the structure shown in FIG. **25**.

FIG. **27** is a cross-sectional view of an embodiment of the present invention having two vertical memory cells with vertical connection of the two memory cells shown in FIG. **23** in the SOI layer, where the vertical memory could work as a DRAM and a nonvolatile memory devices.

FIG. **28** is a schematic diagram of an equivalent circuit for the structure shown in FIG. **25**.

FIG. **29** is a cross-sectional view of an embodiment of the present invention having two vertical memory cells with vertical connection of the two nonvolatile memory cells in the SOI layer.

FIG. **30** is a schematic diagram of an equivalent circuit for the structure shown in FIG. **29**.

FIG. **31** is a cross-sectional view of an embodiment of the present invention having four vertical memory cells with vertical connection of the four nonvolatile memory cells in the SOI layer.

FIG. **32** is a schematic diagram of an equivalent circuit for the structure shown in FIG. **31**.

FIG. **33** illustrates an exemplary 16-transistor nonvolatile memory structure formed with devices illustrated in FIG. **31**.

FIG. **34** is a schematic diagram of an equivalent circuit for the structure shown in FIG. **33**.

## DETAILED DESCRIPTION

Vertically oriented memory structures constituting memory cells, or portions thereof, in a 3-D integrated circuit arrangement in accordance with the present invention, are shown in FIG. **1**. Embodiments of the present invention provide a device integration architecture and technology. More particularly, memory cells, or portions thereof, which are vertically oriented with respect to a major surface of a wafer, are provided so that the effective device density, i.e., devices per unit area of the wafer surface, is increased. In this way, greater functionality can be provided in a chip of a given surface area.

Reference herein to "one embodiment", "an embodiment", or similar formulations, means that a particular feature, structure, operation, or characteristic described in connection with the embodiment, is included in at least one embodiment of the present invention. Thus, the appearances of such phrases or formulations herein are not necessarily all referring to the same embodiment. Furthermore, various particular features, structures, operations, or characteristics may be combined in any suitable manner in one or more embodiments.

Terminology

The term "vertical", as used herein, means substantially perpendicular to a major surface of a substrate, such as, for example, a semiconductor wafer.

The term "Vbias" refers to an applied voltage during operation of an illustrated device. Vbias may be ground, or "0" volts, but is not required to be. The acronym "WL" refers to Word Line, and the acronym "BL" refers to Bit Line. The term "$V_{DD}$" refers to a positive supply voltage. The acronym "SoC" refers to System on a Chip, with "SoCs" being the plural of SoC.

The terms chip, semiconductor device, integrated circuit, LSI device, monolithic integrated circuit, ASIC, SoC, microelectronic device, and similar expressions are sometimes used interchangeably in this field. Microelectronic device may be considered to be the broadest term, encompassing the others. With respect to these microelectronic devices, signals are typically coupled between them and other circuit elements via physical, electrically conductive connections. The point of connection is sometimes referred to as an input, output, terminal, line, pin, pad, port, interface, or similar variants and combinations.

The term "device", as used herein, refers to active and passive circuit elements. "Device" includes, but is not limited to, FETs (n-channel and p-channel), Thyristor, capacitors, varactors, floating gates, charge trap layers, diodes, and resistors.

FET as used herein, refers to metal-oxide-semiconductor field effect transistors (MOSFETs). These transistors are also known as insulated gate field effect transistors (IGFETs). FETs are generally described as three terminal devices having a gate, a source and a drain. Although FETs may be further described as four terminal devices when the body of the FET is considered.

Source and drain terminals refer to the terminals of a FET, between which conduction occurs under the influence of an electric field, subsequent to the inversion of the semiconductor surface under the influence of an electric field resulting from a voltage applied to the gate terminal.

The acronym "SOI" generally refers to Silicon-on-Insulator. As will be appreciated by those skilled in this field, SOI layers can be formed in a variety of ways. Unless otherwise noted, "SOI layer" is used herein to refer to a relatively thin, single crystal portion of a semiconductor wafer that can be cleaved and bonded to another previously fabricated wafer, or similar type of substrate, such that a three dimensional stack is formed from the SOI layer and the previously fabricated wafer or similar type of substrate. In this context, the SOI layer may be thought of as an attachment layer, or stackable add-on structure which is suitable for bonding to a semiconductor substrate already containing devices and/or interconnections. As a stackable add-on layer, the single-crystal layer may have been doped so as to have one or more doped regions vertically adjacent each other. For purposes of this disclosure, doped regions may include intrinsic regions as well as p-type and n-type regions. Individual semiconductor structures may be formed by etching through portions of the doped stack to electrically isolate those structures. These structures may be fitted with contacts, dielectric coatings, or films, gate electrodes, capacitor terminals, and so on. The spaces between such individual structures may be filled with dielectric material so

as to re-form a layer without gaps or voids therein, and thereby provide for mechanical stability, and support for additional stacked layers. Various interconnect layers may be formed and patterned at intermediate levels of the dielectric material. In this way, the stackable add-on layer may provide a plurality of memory cells suitable for connections to an underlying substrate.

The expression "high dielectric constant" refers to a dielectric constant that is greater than the dielectric constant of silicon dioxide.

The expression "3-D IC", as used herein, refers to a three-dimensional integrated circuit that includes a semiconductor substrate having devices and/or interconnect structures fabricated thereon, and least one stackable add-on layer, also having devices and/or interconnect, where the semiconductor substrate and the stackable add-on layer are stacked and bonded to each other.

As shown in FIG. **1**, vertical memory devices **656** in accordance with the present invention are separated by isolation **135** and have floating structures in the filled dielectric materials **133***a*. Vertical memory devices **656** are referred herein to as floating devices (FLD). Embodiments of the present invention are different from a conventional bonded IC layer, which has a shared well **142** or substrate **143**, wherein an electrically common region is located. Additionally, embodiments of the present invention do not have the physically supporting layer which can be found in a conventional SOI IC substrate where all devices in one IC layer are supported by a substrate under a bottom oxide. The layer that includes FLD **656** is called FLD layer **101**. Inter-layer dielectric (ILD) layers **133** disposed above and below FLD layer **101** have interconnection lines **132** and vias, or contacts, **131**. Interconnection lines **132** and vias **131** connect FLDs directly or indirectly within an FLD layer, or connect devices from an FLD layer to another FLD layer or to a base substrate.

Still referring to FIG. **1**, the substrate bonded to lower dielectric layer **151** is called base substrate **103**. The first FLD layer above base substrate **103** is called first FLD layer **101**, and the next FLD layer is called second FLD layer (not shown).

FIG. **1** shows one FLD layer **101** and one base semiconductor substrate **103**. Dashed line **134** denotes a border, or interface, of two ILD layers. First ILD layer **151** has interconnection lines and vias, and base semiconductor substrate **103** shares these interconnections and vias with first FLD layer **101**. Some vias may directly connect to second FLD layer (not shown) from first ILD layer **151**. Also interconnection lines and vias in second ILD layer **152** are shared by first FLD layer **101** and second FLD layers.

Still referring to FIG. **1**, the formation of electrodes to floating memory device **656** is by direct connection to the top **122** and bottom **121** of each floating memory device **656**. Also, in various embodiments of the present invention, floating devices may be constructed that have vertically separated single or more intermediate electrodes **123**. These electrodes could be connected to interconnection lines within ILD layers **151**, **152** disposed on the top and/or bottom of the FLD layer.

In FIG. **1**, a logic circuit **114** including sense amplifier and column/row selectors may be implemented in base semiconductor substrate **103** while nonvolatile memory devices are implemented in first FLD layer **101**, and SRAM devices are in a second FLD layer, in which case one semiconductor substrate could integrate different types of individually optimized devices without using a difficult and expensive SoC structures or semiconductor processes.

Various embodiments of the present invention do not require a physically supporting substrate for floating devices. Also, without a base substrate, various embodiments could exist along with interconnection lines, vias, and FLDs only.

Various embodiments of the present invention provide floating devices that are separated by dielectric isolation regions. These electrically separated structures do not have the parasitic devices which are typically found in prior art approaches.

Various embodiments of the present invention provide floating devices that may be connected directly or indirectly.

In various embodiments of the present invention, combining the SOI layer with a semiconductor substrate does not require the same type of wafer alignment structures as are used in photolithographic processes, rather, the wafer alignment structure may be implemented as a wafer alignment mark, or as a bump-type alignment structure. Alternatively, without a wafer alignment structure, the SOI layer could be transferred along with a simple notch alignment because the transferred SOI layer does not have structures for multiple devices, such as isolation structure or interconnection lines, which are horizontally divided. The transferred, unpatterned, SOI layer has only a vertically oriented stack of layers.

In various embodiments of the present invention, a FLD can be directly contacted by metal electrodes at top, bottom, and intermediate regions of the individual doped stack structures (i.e., pillar structures). The area of the metal electrodes can be the same as the top and bottom areas of individual doped stack structures of the FLD. Therefore, the voltage drop of the device due to contact resistance can be reduced as compared to conventional laterally oriented devices.

The bottom of the FLD is connected to metal layer **121** which is also directly connected to vias **131** in ILD layer **151**. Therefore, the bottom of FLD essentially has a preformed electrode and contact. The top of the FLD may be connected to metal layer **122** which is also directly connected to vias **131** in ILD layer **152**.

Multiple FLD layers can be stacked, thereby increasing the effective device density.

FLDs may, but are not required to, have a pillar structure. Conventional pillar type Surrounding Gate Transistor (SGT) structures are difficult to integrate with optimized horizontal (i.e., lateral, or co-planar) devices. Integration may cause the shadow effect to occur during ion implantation due to the presence of pillar type transistor structures. Also, conventional SGT structures do not provide for high integration density because of processing problems associated with forming electrodes at the source/drain and gate regions. Therefore, these conventional approaches are not suitable for SoC formation. However, the add-on pillar type SGT structures in accordance with the present invention, may be combined with conventionally processed wafers.

An FLD can be fabricated to be in full or partial depletion mode, by control of the FLD width. The depletion mode can also be controlled by the operational voltage and dielectric constant of the gate dielectric material.

An advantage of embodiments of the present invention is that because the detached surface of the SOI substrate typically corresponds to a heavily doped source/drain region of a memory, even though small surface defects may be present, there is little impact on gate oxide quality, device operation, or yield, from these surface defects.

The FLD may have a graded impurity distribution in the channel region. The graded impurity distribution in the

channel region of devices in accordance with the present invention may give rise to induced electric fields that accelerate current flow and reduce the Short Channel Effect, as compared to conventional devices. The graded impurity distribution can readily be formed by ion implantation or by an epitaxial process. Increased impurity concentration in the channel region from source to drain side provides for asymmetric operation. For example, a Lightly Doped Drain (LDD) structure could be selectively formed at one of the source/drain terminals (which in operation would be the drain terminal). It is difficult to implement graded impurity distribution in the channel of conventional horizontal MOSFETs because of difficulties in high tilt ion implantation and device layout.

The FLD, in accordance with the present invention, has a gate dielectric layer which may be implemented with process operations at temperatures below 650° C. The dielectric layer could be thermal oxide, deposited oxide, oxynitride, or a combination of oxide and nitride, such as an oxide-nitride-oxide (ONO) layer, or a nitride-oxide (NO) layer. Any suitable dielectric material could be used except films requiring processing at temperatures more than 650° C. Another advantage of embodiments of the present invention is that it is easy to use high dielectric constant (high-k) materials in the gate dielectric layer, such as, but not limited to, $Al_2O_3$, $ZrO_2$, $HfO_2$, $Y_2O_3$, $La_2O_3$, $Ta_2O_5$, $TiO_2$, and BST. In conventional manufacturing of MOSFETs, a high temperature heat activation operation is required after the source/drain ion implantation. At this time, the properties of high-k materials can be altered. However, the FLD architecture does not require a high temperature process, and so high-k materials could be used at stable condition. Also, if Atomic Layer Deposition (ALD) is used to provide the gate dielectric layer, then a substantially uniform layer can be obtained.

In order to prevent diffusion of oxidant and undesired oxidation of via **131** and/or interconnection **132** during the thermal gate oxidation process, it may be desired to have moisture blocking layer below the gate insulator layer **183**. The moisture blocking layer may be, but is not limited to, a nitride layer or an oxynitride film. Such a moisture blocking layer may be disposed in ILD layer **151**, or dielectric layer **133***a* under gate insulator layer **183**.

In accordance with the present invention, FET threshold voltage can be controlled by changing the gate dielectric thickness and/or the width of the FLD. If different gate dielectric thickness is used or different dielectric constant materials are used at FLD, then multiple operational voltages and threshold voltages could be implemented at the same stackable add-on layer. Also, because the FLD may be produced at low temperature, and a surrounding gate is used, it is less difficult to use a metal gate as compared to conventional manufacturing approaches.

In accordance with the present invention, memory devices could be implemented using FLDs. The following illustrative embodiments of the present invention use n-type enhancement MOSFETs. As will be appreciated by those skilled in this field, p-type and/or depletion mode FETs, or bipolar transistors could be used in various memory cell implementations.

FIG. **2** shows a DRAM cell with vertical connection of a capacitor and a MOSFET in the stackable add-on layer. A source/drain terminal of the access transistor is extended to the vertical capacitor. FIG. **3** shows a schematic diagram of an equivalent circuit for the structure shown in FIG. **2**.

The gate insulators **183** for the transistor and capacitor in FIG. **2** are separated. However, in some embodiments these might be grown at the same time and could be used for the transistor and capacitor as a continuous gate insulator film. Multi-gate devices in accordance with the present invention may use such continuous gate insulator films.

FIG. **4** shows two vertical DRAM cells with vertical connection of a capacitor and a MOSFET, respectively in the stackable add-on layer. The structure shares a single bit line, therefore, the density of DRAM cells increases by a factor of two while the aspect ratio of SOI pillar **124** remains relatively small. FIG. **5** shows a schematic diagram of an equivalent circuit for the structure shown in FIG. **4**.

FIG. **6** shows a dual port DRAM cell with vertical connection of a capacitor and two MOSFETs in the stackable add-on layer. As can be seen in FIG. **6**, one capacitor CAP disposed in the central portion of SOI pillar **124** is shared by two vertical MOSFETs. In this case, the information in the shared capacitor may be accessed through the top and bottom access MOSFETs. Therefore, this structure may function as a dual-port DRAM cell. The structure of FIG. **6** increases density by a factor of two while the aspect ratio of SOI pillar **124** remains relatively small. FIG. **7** shows a schematic diagram of an equivalent circuit for the structure of FIG. **6**.

FIG. **8** shows a vertical DRAM cell with vertical connection of a MOSFET in the SOI layer and a external capacitor in bottom dielectric layer **151**. The capacitor may be MIM (Metal-Insulator-Metal), PIP (Poly-Insulator-Poly), MIP (Metal-Insulator-Poly), or Trench capacitor in base substrate **103**. Without external capacitor, the single MOSFET in SOI pillar **124** could work as a DRAM cell because electric charge is temporarily accumulated in the body (p-region) when the body of the MOSFET is floating.

FIG. **9** illustrates an exemplary DRAM structure formed with devices illustrated in FIG. **8**. The external capacitor is placed in bottom ILD layer **151**. The external capacitor may alternatively be placed in top dielectric layer **152** as shown in FIG. **10**. In a further alternative, the external capacitor may be placed in top **151** and bottom **152** dielectric layers as shown in FIG. **11**. In this case, the capacitor takes more space to store more charge, which may increase the time between refresh cycles, and increase the effective operational speed of the DRAM.

FIG. **12** shows two vertical DRAM cells with vertical connection of two MOSFETs in the stackable add-on layer and two external capacitors. Without external capacitor, the MOSFETs in the SOI pillar **124** could work as a DRAM cell either as explained in FIG. **8**. FIG. **13** shows a schematic diagram of an equivalent circuit for the structure shown in FIG. **12**.

FIG. **14** shows a Negative Differential Resistance based vertical SRAM cell with vertical connection of two MOSFETs in the stackable add-on layer. The top MOSFET has gate insulator **183***c* which induces charge trapping and discharging, and therefore, creates negative differential characteristics when the drain bias is higher than the gate bias. FIG. **15** shows a schematic diagram of an equivalent circuit for the structure shown in FIG. **14**.

FIG. **16** shows another NDR (Negative Differential Resistance) based vertical SRAM cell with vertical connection of a Thyristor and a MOSFET in the stackable add-on layer. The intermediate gate, WL**2**, controls diode action between p- and n-regions, therefore, it triggers snapback of the Thyristor to latch SRAM. FIG. **17** is a schematic diagram of an equivalent circuit for the structure shown in FIG. **16**.

FIG. **18** shows a cross-sectional view of an embodiment of the present invention having a Negative Differential Resistance based vertical SRAM cell With vertical connec-

tion of a bi-stable diode and a MOSFET in the stackable add-on layer. The bi-stale diode, which is implemented as a sandwich of p+/GeSi/n+, uses a tunneling diode property, that creates negative resistance when the applied bias goes up. Other tunneling diodes may be substituted for the p+/GeSi/n+ diode. The output node, Vout, is connected to a load resistor, Rload, or another tunneling diode. FIG. **19** is a schematic diagram of an equivalent circuit for the structure shown in FIG. **18** including load resistor Rload.

FIG. **20** shows a cross-sectional view of an embodiment of the present invention having a Negative Differential Resistance based vertical SRAM cell including the vertical connection of two Thyristor/MOSFET pairs, in the stackable add-on layer. In this embodiment of the present invention, the two Thyristor-type SRAMs are stacked in vertical the direction and a bit line is shared in the middle of SOI pillar **124**. FIG. **21** is a schematic diagram of an equivalent circuit for the structure shown in FIG. **20**.

One drawback of the structure in FIG. **20** is its high aspect ratio, which may cause toppling during processing. Therefore, if two stackable add-on layers having a Thyristor-type SRAM cell are vertically stacked as shown in FIG. **22**, the problem of high aspect ratio can be decreased.

FIG. **23** shows a vertical memory cell with a vertical MOSFET in a stackable add-on layer, where the vertical memory has a floating gate **123***k* and a control gate **123**, and could work as a DRAM and/or a nonvolatile memory device. Nonvolatile memory devices usually have permanent (or relatively long term) charge storage nodes. In this structure, floating gate **123***k* is the charge storage node. However, when the body region is floating, charge is temporarily stored in the body region (p-doped region) and could be used for DRAM operation. FIG. **24** is a schematic diagram of an equivalent circuit for the structure shown in FIG. **23**.

FIG. **25** shows a cross-sectional view of an embodiment of the present invention having a vertical memory cell with a vertical MOSFET in a stackable add-on layer, where the vertical MOSFET of the memory cell has a charge-trapping gate insulating layer. Such a device could work as a DRAM or as a nonvolatile memory device. The charge-trapping gate insulating layer **183***g* may be, for example, an oxide-nitride-oxide film. This nonvolatile memory device has a permanent (or relatively long term) charge storage node within the oxide-nitride-oxide film, which may have a multi-bit property depending on charge storage location. This structure may be used to create a circuit that works as a DRAM, as explained in connection with FIG. **24**. FIG. **26** is a schematic diagram of an equivalent circuit for the structure shown in FIG. **25**.

FIG. **27** shows two vertical memory cells (of the type shown in FIG. **23**) configured to provide a vertical connection between the two memory cells in a stackable add-on layer. This structure shares a bit line and may reduce aspect ratio of SOI pillar **124**. The dual-gate nonvolatile memory cell could be replaced by single-gate nonvolatile memory cell shown in FIG. **25**. FIG. **28** is a schematic diagram of an equivalent circuit for the structure shown in FIG. **27**.

FIG. **29** shows two vertical memory cells with vertical connection of the two nonvolatile memory cells in the stackable add-on layer. Each nonvolatile memory cell has a single-gate select gate (SG) MOSFET and a dual-gate charge storage MOSFET. FIG. **30** is a schematic diagram of an equivalent circuit for the structure shown in FIG. **29**.

FIG. **31** shows four vertical memory cells with serial connection of the four nonvolatile memory cells in the stackable add-on layer. The nonvolatile could be single-gate instead of dual-gates. FIG. **32** is a schematic diagram of an equivalent circuit for the structure shown in FIG. **31**.



FIG. **33** illustrates an exemplary 16-transistor nonvolatile memory structure formed with devices illustrated in FIG. **31**. Such a 16-transistor nonvolatile memory may be part of a NAND architecture flash memory product. This type of NAND-type structure is also suitable for use in logic applications. The select transistors may be placed in base substrate **103** or in stackable add-on layer **101**. FIG. **34** is a schematic diagram of an equivalent circuit for the structure shown in FIG. **33**.

## CONCLUSION

As disclosed herein, vertical DRAM cells have at least one vertical transistor and a capacitor, where the capacitor temporarily stores electric charges and requires refresh. The capacitor could be implemented as an extension of vertical SOI pillar or may be placed outside of the stackable add-on layer, where the capacitor is serially connected to the transistor. Or, as a body part of the vertical transistor, the capacitor could be placed in parallel with a transistor. Dual-port DRAM shares single capacitor and increases memory density.

Vertical SRAM has at least one vertical transistor and a serially connected NDR device, where the NDR may be a Thyristor, charge-trapping MOSFET, or tunneling (or bi-stable) diode.

Vertical nonvolatile memory has a form of either dual-gate with floating gate or single-gate with charge trapping gate insulator. Since the body of SOI pillar is usually floating, the nonvolatile could work as a DRAM device.

Multiple memory cells may be vertically stacked, either in a single stackable add-on layer, or in two or more stacked stackable add-on layers. Since vertically stacked multiple memory cells may share a bit line, the effective aspect ratio of the SOI pillar could be decreased compared with individually stacked memory structure.

All of the memory devices, or cells, described herein may have redundant devices, or cells, in the stackable add-on layer for replacing defective elements thereof.

It is to be understood that the present invention is not limited to the embodiments described above, but encompasses any and all embodiments within the scope of the subjoined Claims.

What is claimed is:

**1**. A semiconductor memory structure, comprising:

a substrate having electrical devices formed therein, and further having at least one dielectric layer and at least one interconnect layer disposed above the substrate; and

a first stackable add-on layer, the first stackable add-on layer including a plurality of vertically oriented semiconductor memory cells disposed within the first stackable add-on layer, the plurality of vertically oriented semiconductor memory cells separated from each other by dielectric material;

wherein the stackable add-on layer is bonded to a layer of the substrate that is the greatest distance from the substrate as measured from the bottom surface of the substrate; and

wherein the memory cell is a DRAM having at least one transistor.

**2**. The semiconductor memory structure of claim **1**, wherein the vertically oriented memory cell comprises a vertical transistor and a serially connected capacitor in a SOI pillar.

3. The semiconductor memory structure of claim 1, wherein the vertically oriented semiconductor memory cell comprises a vertical transistor in an SOI pillar and a capacitor connected in series therewith, the capacitor disposed external to the first stackable add-on layer.

4. The semiconductor memory structure of claim 1, wherein the vertically oriented semiconductor memory cell comprises:

a first capacitor,

a first access transistor serially connected to the first capacitor,

a second access transistor serial connected to the first access transistor, and

a second capacitor serially connected to the second access transistor;

wherein the first capacitor, the first access transistor, the second access transistor, and the second capacitor are all formed in a single vertically oriented SOI pillar.

5. The semiconductor memory structure of claim 1, wherein the vertically oriented semiconductor memory cell comprises two vertically oriented, serially connected transistors formed on a SOI pillar, the serially connected transistors further connected to a capacitor disposed external to the stackable add-on layer.

6. The semiconductor memory structure of claim 1, wherein the vertically oriented semiconductor memory cell comprises two vertically and serially connected transistors and a shared serially connected capacitor in a SOI pillar.

7. The semiconductor memory structure of claim 1, wherein the vertically oriented semiconductor memory cell comprises:

a first diode;

a first access transistor connected in series to the first diode;

a second access transistor connected in series to the first access transistor;

a third access transistor connected in series to the second access transistor; a fourth access transistor connected in series to the third access transistor; and

a second diode connected in series to the fourth access transistor;

wherein the first diodes the first, second, third, and fourth transistors, and the second diode are formed on the same SOI pillar.

8. A semiconductor memory structure, comprising:

a substrate having electrical devices formed therein, and further having at least one dielectric layer and at least one interconnect layer disposed above the substrate;

a first stackable add-on layer, the first stackable add-on layer including a plurality of vertically oriented semiconductor memory cells disposed within the first stackable add-on layer, the plurality of vertically oriented semiconductor devices separated from each other by dielectric material; and

wherein the stackable add-on layer is bonded to a layer of the substrate that is the greatest distance from the substrate as measured from the bottom surface of the substrate; and

wherein the memory cell is an SRAM having at least one Negative Differential Resistance device.

9. The semiconductor memory structure of claim 8, wherein the vertically oriented semiconductor memory cell comprises a vertically oriented transistor and a vertically oriented NDR-type Thyristor serially connected to each other.

10. The semiconductor memory structure of claim 9, wherein the vertically oriented transistor is formed on an SOI pillar and the vertically NDR-type Thyristor is formed on an SOI pillar.

11. The semiconductor memory structure of claim 9, wherein the vertically oriented transistor and the vertically NDR-type Thyristor are formed on two separated SOI pillars.

12. The semiconductor memory structure of claim 8, wherein the vertically oriented transistor and the vertically NDR-type Thyristor are formed on the same SOI pillar.

13. A semiconductor memory structure, comprising:

a substrate having electrical devices formed therein, and further having a dielectric layer disposed above the electrical devices;

a stackable add-on layer having a plurality of vertically oriented semiconductor memory cells; and

the stackable add-on layer being bonded to the dielectric layer; and

wherein the memory cells are nonvolatile memory cells having at least one transistor.

14. The semiconductor memory structure of claim 13, wherein the vertically oriented semiconductor nonvolatile memory cell comprises a vertical transistor having a floating gate and a control gate on a SOI pillar.

15. The semiconductor memory structure of claim 13, wherein the vertically oriented semiconductor nonvolatile memory cell comprises a vertical transistor having a charge-trapping gate insulator and a gate on a SOI pillar.

16. The semiconductor memory structure of claim 13, wherein at least two nonvolatile memory cells are vertically oriented and serially connected together and formed with a first SOI pillar.

17. The semiconductor memory structure of claim 16, wherein the at least two nonvolatile memory cells on the first SOI pillar are serially connected with an interconnect line disposed on a dielectric layer, to a nonvolatile memory cell formed with a second SOI pillar.

* * * * *